819 F.2d 574
 Bankr. L. Rep. P 71,868, 23 Fed. R. Evid. Serv. 790
In the Matter of BOBBY BOGGS, INC., Debtor.
TRINITY NATIONAL BANK, Plaintiff-Appellant,
v.
BOBBY BOGGS, INC., Defendant,
Office of Judicial Insurance Receivership for the State of
Texas, as Receiver for Eastern Indemnity Company
of Maryland, Appellee.
 No. 87-1013
Summary Calendar.
 United States Court of Appeals,
Fifth Circuit.
 June 19, 1987.
 
 George C. Black, Jr., Black & Roberts, Dallas, Tex., for plaintiff-appellant.
 Gerrit M. Pronske, Pulliam, Hale, Spencer, Goodman, Stanley, Pronske & Trust, Dallas, Tex., for Office of Judicial.
 Appeal from the United States District Court for the Northern District of Texas.
 Before CLARK, Chief Judge, and GARWOOD and HILL, Circuit Judges.
 GARWOOD, Circuit Judge:
 
 
 1
 This dispute involves $90,000 paid by a project general contractor to the trustee-in-bankruptcy of a now-bankrupt subcontractor for work the subcontractor had performed on the project. In the bankruptcy court, Trinity National Bank of Dallas ("Trinity Bank"), which had loaned working capital to the subcontractor, claimed that it was entitled to the $90,000 because of Trinity Bank's security interest in the subcontractor's accounts receivable. Contesting Trinity Bank's claim was the Eastern Indemnity Company of Maryland ("Eastern Indemnity" or "the surety"), which had issued seven pairs of performance and payment bonds as the surety for the subcontractor's performance obligations to the project contractor and for the subcontractor's payment obligations to its own materialmen and sub-subcontractors. Eastern Indemnity had paid debts to two of its principal's sub-subcontractors on the project after its principal, the now-bankrupt subcontractor, defaulted. In the bankruptcy court, Eastern Indemnity claimed that its right to the fund took the form of subrogation which, under Texas law, had priority over the claim of Trinity Bank, or, alternatively, that the bank had subordinated its priority to the surety's. After Eastern Indemnity's motion was filed, it was declared insolvent and its claim has since been pursued by the Office of Judicial Insurance Receivership for the State of Texas ("the Receiver").
 
 
 2
 The bankruptcy court, affirmed by the district court, held that the Receiver, asserting Eastern Indemnity's claim, had first claim upon the funds on the two alternate theories advanced by Eastern Indemnity. We affirm.
 
 I.
 
 3
 On February 26, 1982, the Dallas-Fort Worth Hotel Limited Partnership entered an agreement with Rucker-Sundt General Contractors ("the project contractor") whereby the latter agreed as general contractor to construct the Dallas-Fort Worth Airport Hilton Hotel and Executive Conference Center ("the DFW Hotel"). Preparing for this agreement, on February 22 the project contractor arranged a subcontract for dry-wall, acoustic, and plaster work amounting to $1,869,000 in total value on the DFW Hotel with Bobby Boggs, Inc. (Boggs' corporation is identified in this opinion as "Boggs," and the individual, Mr. Robert "Bobby" Boggs, as "Mr. Boggs"). The subcontract required Boggs to furnish the project contractor with bonds guaranteeing Boggs' performance of the work called for under the subcontract (performance bonds) and guaranteeing the payment of any laborer, subcontractor, or supplier to whom Boggs incurred debts based on the subcontract (payment bonds).
 
 
 4
 Boggs enlisted the assistance of an independent insurance agency, the Bill R. Jones Insurance Agency ("Jones Insurance"), in finding a surety. By letter dated March 10, 1982, and signed by an assistant vice president of Trinity Bank (Boggs' primary lender), the bank wrote Howard Cowan ("Cowan"), then associated with Jones Insurance, that Mr. Boggs was a "well established corporate and personal customer" of the bank. The letter stated that Trinity Bank had, in January 1982, loaned Boggs' company $250,000 for which "Contract Accounts Receivable were pledged." The letter also stated that, "[i]n regard to receivables due from the 'DFW-Hilton' contract, we hereby agree to be in a secondary position in relation to the Surety Company's superior position."
 
 
 5
 Cowan evaluated Mr. Boggs' personal and corporate financial position and history and prepared an information packet dated March 24, 1982, for consideration by bonding companies.[1] The packet included a copy of the March 10 letter from Trinity Bank's assistant vice president, and a copy of the packet was sent to Eastern Indemnity. Cowan, who was accepted as an expert by both Eastern Indemnity and Trinity Bank, testified in his deposition that surety companies sometimes required "a formal subordination agreement" but at times would "simply ... take a statement from the commercial loan officer that the bank would subordinate their position on the bonded receivables." Cowan also stated that bonding companies looked for subordination to occur before the bond would be issued, remarking,
 
 
 6
 "[T]he underwriting process would be brought to a halt if a lending institution that had a blanket collateral position ... refused to subordinate the position on the bonded receivables[.] I do not know of any surety company that would write contract bonds on that basis."
 
 
 7
 On June 11, 1982, seven pairs of performance and payment bonds in favor of the project contractor were issued with Boggs as the principal and Eastern Indemnity as the surety. As set out in the margin, the bankruptcy court found each pair of bonds applied to one of seven phases of the subcontract. Each of the fourteen bonds was in the amount of $267,000; the surety's total exposure to liability was thus $1,869,000, the exact amount called for under the subcontract between Boggs and the project contractor.[2] After the bonds were issued, by a letter dated November 19, 1982, the president of Trinity Bank informed Eastern Indemnity that the bank "has been assigned by [Boggs] a security interest in the form of accounts receivable" in the DFW Hotel subcontract; the letter was silent as to the relative priority of the surety and bank, and Eastern Indemnity did not respond to it.
 
 
 8
 Evaluating the issuance of these bonds, the bankruptcy court found that Trinity Bank's assistant vice president had apparent authority to send the letter subordinating the bank's secured claims in Boggs' accounts receivable to claims Eastern Indemnity might assert as surety; that Eastern Indemnity required such a subordination letter as a precondition to its acting as a surety; that Trinity Bank knew Boggs could not perform work on the DFW Hotel without having a surety and that the bank intended a surety to rely on the letter; that Boggs owed Trinity Bank an aggregate principal of $553,000 and a total debt (as of January 22, 1986) in excess of $600,000; that the bank's subordination of its secured status to the potential claims of Eastern Indemnity was supported by valuable consideration, impliedly because Boggs' acquisition of the subcontract would enhance Boggs' ability to repay the bank; and that Cowan and Jones Insurance acted as agents of Eastern Indemnity.
 
 
 9
 The bankruptcy court also found that Eastern Indemnity had established an interest in real estate personally owned by Boggs as collateral securing the surety's position; that Boggs ceased work on the DFW Hotel on or about September 30, 1983, at which time Boggs filed a petition for Chapter 11 bankruptcy; and that Boggs defaulted on an obligation to pay one of its subcontractors on the DFW Hotel, Wigley Construction Co. ("Wigley"). Wigley brought suit against Eastern Indemnity on its payment bond and received $180,000 from the surety in satisfaction of its claim in October 1984.
 
 
 10
 The bankruptcy Trustee appointed for the limited purpose of liquidating and collecting the bankrupt subcontractor's accounts receivable first recovered some $82,000 from the collateral securing the bonds,[3] which the Trustee paid to Eastern Indemnity in partial satisfaction of its claim arising from the surety's payment to Wigley (leaving $97,998.81 outstanding), and then collected $90,000 owed to Boggs by the project contractor. On December 20, 1984, the surety filed a motion to compel payment to it of this $90,000 ("the fund").[4] Trinity Bank, the only other claimant asserting an interest in the fund, countered that it was entitled to the fund as a secured creditor. Subsequent to this filing, the surety was declared insolvent and the Receiver assumed its claims.
 
 
 11
 The pertinent conclusions of law by the bankruptcy court were as follows:
 
 
 12
 "That Eastern Indemnity, by virtue of payment made to Wigley in satisfaction of secondary liability on the Payment Bonds and Performance Bonds, became subrogated to the Fund.
 
 
 13
 "....
 
 
 14
 "That Eastern Indemnity's subrogation rights are not dependent upon an assignment of accounts receivable or contract rights under the Texas Business and Commerce Code.
 
 
 15
 "That Eastern Indemnity was subrogated directly to the rights of [the project contractor].
 
 
 16
 "That the subrogation rights of Eastern Indemnity cut off any rights that Boggs may have had to the fund.
 
 
 17
 "That Trinity, as assignee of Boggs, can have no greater rights to the Fund than that of Boggs. [Citing First Hutchings-Sealy National Bank v. Aetna Casualty & Surety Co., 532 S.W.2d 114 (Tex.Civ.App.--Houston [1st Dist.] 1975, writ ref'd n.r.e.) ]."
 
 
 18
 In its supplemental findings and conclusions, the bankruptcy court substituted as the primary ground for its decision that Trinity Bank, by its letter, had subordinated itself to Eastern Indemnity. The bankruptcy court retained, with some further amplification, the subrogation ground it had originally set forth as an alternate basis for the judgment. The district court affirmed in a succinct memorandum opinion approving the legal reasoning of the bankruptcy court and indicating that no findings of fact were clearly erroneous.
 
 II.
 
 19
 Trinity Bank raises four issues in its appeal: (1) that its perfected security interest in Boggs' accounts receivable had priority over rights of Eastern Indemnity based on subrogation; (2) that the March 10 letter did not effectively subordinate the bank's claims to the surety's; (3) that admitting the payment and performance bonds was improper because they were not properly authenticated; and (4) that the bonds were not cumulative and evidenced an obligation on the part of the surety of only $267,000. Because the bankruptcy court relied on subrogation and subordination as alternate theories supporting the surety's priority, and because we affirm on the ground that Trinity Bank subordinated its interests to those of Eastern Indemnity, we express no opinion on the issue of whether the surety may also have had priority on the subrogation theory.
 
 A. Subordination
 
 20
 As the facts set forth above and additional testimony in the record indicate, Elaine Stiegler ("Stiegler"), an assistant vice president of Trinity Bank, dealt with individual and commercial loans and was the primary loan officer for Boggs. It was she who authored the March 10 letter to Cowan indicating the bank's readiness to take second place behind a surety. Testimony showed she also signed loan papers relating to transactions with Boggs, and, although the bank's president testified at trial that there were limitations on her authority, he also acknowledged that these limitations were not revealed to Eastern Indemnity. The bankruptcy court's conclusions of law viewed the letter as an offer which Eastern Indemnity accepted by issuing the bonds, thereby establishing a binding agreement between them, and the consideration flowing to Trinity Bank as Boggs' enhanced ability to repay his loan obligations.
 
 
 21
 During the proceedings below, Trinity Bank argued that there was no contract, that there was only "nebulous" consideration, and that Stiegler lacked authority to subordinate the bank's priority to Eastern Indemnity's. The portions of the bank's briefs in this Court addressing the issue of whether a binding agreement existed essentially restate these arguments without citing Texas authorities which support its contention that the bankruptcy court "erred as a matter of law" in finding that a binding agreement existed whereby the bank subordinated its priority to the surety's.[5] Further, this Court has indicated a lower court's finding that a contract existed or did not exist may be reviewed under the clearly erroneous standard as a finding of fact. E.g., Carpenters Amended and Restated Health Benefit Fund v. Holleman Construction Co., Inc., 751 F.2d 763 (5th Cir.1985); Hollywood Golf Estates v. Nello L. Teer Co., 353 F.2d 485 (5th Cir.1965).
 
 
 22
 In any event, we reject the bank's argument. We discern no clear error in the bankruptcy court's conclusion that a binding agreement existed. Even if no bilateral contract existed, the result below is nevertheless supported by the Bankruptcy Code's equitable subordination provision as well as by the recognition of promissory estoppel in Texas law and the applicability of that doctrine to the facts of this case. The doctrine of promissory estoppel in Texas law consists of four elements:
 
 
 23
 "To invoke the doctrine of promissory estoppel (1) there must be a promise on the part of the defendant, (2) foreseeability by the defendant that the plaintiff would rely thereon, (3) substantial reliance thereon by the plaintiff to his detriment, and (4) a finding that injustice can be avoided only by enforcement of the promise." 34 Tex.Jur.3d Estoppel Sec. 12, at 565 (1984) (footnote omitted; citing cases).[6]
 
 
 24
 There is clearly sufficient evidentiary support for each of these elements. The statements in the March 10 letter from Trinity Bank that it had loaned Boggs funds on the project and had an assignment of his receivables therefrom as security and that "[i]n regard to receivables due from the 'DFW-Hilton' contract, we hereby agree to be in a secondary position in relation to the Surety Company's superior position" (emphasis added) was obviously a promise. The wording of the letter itself, and the fact that it was sent to the firm that was arranging performance and payment bonds to cover Boggs on the project, plus the evidence as to industry custom, show that reliance by the surety was foreseeable by Trinity Bank. Why else would the letter be written? This same evidence, particularly that as to industry custom, plus the fact that the surety issued the bonds after a copy of the letter was furnished it together with the other material relevant to deciding whether to bond Boggs on this project, adequately demonstrate detrimental reliance. Certainly there was no evidence to the contrary. Enforcement of the promise was necessary to avoid injustice under the circumstances.
 
 
 25
 As argued in the Receiver's First Amended Motion for Release of Proceeds, equitable subordination (recognized in 11 U.S.C. Sec. 510(c)(1)) was an alternate basis for finding that Eastern Indemnity's claim had priority. In support of this theory, the Receiver discussed the elements of promissory estoppel and the applicability of those principles to this dispute. As we construe the Texas decisions invoking promissory estoppel, the doctrine recognizes that performance can render binding a unilateral promise which is foreseeably and detrimentally relied upon. The Trinity Bank letter, provided to Jones Insurance for the purpose of assisting Boggs' search for a surety, contemplated that some surety would consider the promise therein in making its decision whether to issue bonds. Although the bank may not have known the name of the surety that would act upon the bank's promise to take second priority, the letter did not in any way restrict its promise to any particular bonding company.
 
 
 26
 If a binding agreement existed, as the bankruptcy court found, subordination was proper under 11 U.S.C. Sec. 510(a) (subordination by agreement); if no agreement existed, the record before us and the principles of promissory estoppel also support finding equitable subordination under 11 U.S.C. Sec. 510(c)(1). Even if we were to conclude the bankruptcy court erred in finding a binding subordination agreement existed, which we do not, the result reached by that court nevertheless would be proper under the equitable subordination principle, rendering any such error harmless.[7] Accordingly, we find that there is no basis for us to overturn the conclusion of the bankruptcy court that Trinity Bank's priority was subordinate to that of Eastern Indemnity.
 
 B. Admissibility of the bonds
 
 27
 The bonds--and numerous other documents from the files of Eastern Indemnity--were offered into evidence by the Receiver's counsel. Accompanying the bonds were the Receiver's affidavit, which claimed that he had personal knowledge of the files of Eastern Indemnity and of Boggs and which stated that he was familiar with the underlying files. The parties had stipulated that the Receiver would not be called as a witness, and Trinity Bank acknowledged that it had the opportunity to depose the Receiver, although it did not do so.
 
 
 28
 The Receiver argued that documents from Eastern Indemnity's files were admissible as prima facie evidence on the authority of a provision of Texas law, Tex.Ins.Code art. 21.28, Sec. 11.[8] Although Trinity Bank did not dispute that the bonds had been properly certified by the Receiver, it nevertheless challenged admission of the bonds into evidence on several grounds: the bank generally questioned the bonds' authenticity, protested the use of copies, and contended that the documents were not admissible under the Federal Rules of Evidence.
 
 
 29
 On appeal, Trinity Bank claims that no specific provision of the Federal Rules of Evidence allowed these bonds to be admitted and that the bankruptcy court misplaced the burden of proof by admitting the bonds absent a showing from the bank that the documents were not what they purported to be. The bank argues that Rule 1002 requires the original of a writing, and that Rule 1003--permitting duplicates--is inapplicable if a genuine question of authenticity is raised. The bank claims that the Receiver did not authenticate the bonds by any of the means provided by Rule 901 and that the bonds were not self-authenticating documents under any of the subsections of Rule 902.
 
 
 30
 The bank's arguments misperceive the function of the rules governing authenticating documents. Rule 901(a) provides (emphasis added): "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Rule 901(b) offers ten examples "[b]y way of illustration only, and not by way of limitation." Included among the examples offered by Rule 901 is "testimony [of a witness with knowledge] that a matter is what it is claimed to be." Rule 901(b)(1).
 
 
 31
 As the advisory committee note to Rule 901(a) points out, "Authentication and identification represent a special aspect of relevancy.... This requirement of showing authenticity ... falls in the category of relevancy dependent upon fulfillment of a condition of fact and is governed by the procedure set forth in Rule 104(b)." Rule 104(b) provides, "When the relevancy of evidence depends upon the fulfillment of a condition of fact, the court shall admit it upon, or subject to, the introduction of evidence sufficient to support a finding of the fulfillment of the condition." Rules 901(a) and 104(b) allow evidence to be admitted on a prima facie showing of relevancy and authenticity. See 11 J. Moore, Moore's Federal Practice Secs. 901.03 to .04, at IX-15 to -16 (2d ed. 1985).
 
 
 32
 The "condition of fact" upon which the relevancy of the bonds depended was whether there was evidence sufficient to support a finding that Eastern Indemnity had obligated itself to stand as surety for Boggs. Similarly, the "condition of fact" relevant to the authenticity of these bonds was whether there was evidence sufficient to find that Eastern Indemnity had issued bonds covering the full subcontract amount and whether these bonds represented that obligation.
 
 
 33
 The record indicates that the bankruptcy court had ample evidence from which to conclude that the Receiver produced a prima facie case on both points: The subcontract, admitted into evidence, called for such bonds; Trinity Bank's letter of March 10 recognized that bonds were to be issued; Trinity Bank managed a joint account for Boggs and the surety; Cowan testified in detail about locating a surety for Boggs; evidence was admitted showing that the surety had satisfied two claims against Boggs after his default; the performance bonds and one of the payment bonds were notarized, which may well have made the notarized bonds self-authenticating in any event under Rule 902(8); as discussed below, the amount of the surety's obligation evidenced by the bonds corresponded with the amount of the subcontract; and, finally, the existence and validity of the bonds had been accepted both by the Trustee and by the Receiver, either of whom could have attacked their validity.
 
 
 34
 Furthermore, although state statutes allowing the admission of documents from a defunct insurer's files in state proceedings are not specifically recognized as supporting a finding of authenticity for purposes of evidentiary admissibility under the Federal Rules of Evidence, we think the Texas statute is at least analogous to the examples offered by Rule 901(b) as means of establishing prima facie authentication, just as we view the Receiver's certificate as analogous to the "testimony of [a] witness with knowledge" example of Rule 901(b)(1). Rule 901 does not specifically bar reference to statutes like the Texas law but, instead, suggests that the authentication requirement may be met in many ways. The Texas statute allows a receiver appointed by the State to assume management of a defunct insurer's affairs; the receiver will not have prepared or maintained the insurer's business records and may not have access to more traditional means of authenticating the insurer's documents; the Texas statute addresses these problems by allowing the admission of such records but limiting their effect to establishing only prima facie evidence of the facts contained in the documents. Although this case arose in a bankruptcy court, that court sat in Texas and the competing claims to this fund are at core a creditors' priority dispute governed by state law. In this context, we do not believe the bankruptcy court abused its discretion by giving the Texas statute an effect similar to the effect it would have had if a similar dispute had arisen in the State's courts.[9]
 
 
 35
 Finally, we observe that Trinity Bank's attack was addressed solely to the admissibility of the bonds and included no evidence indicating nor any specific assertion that the bonds were other than what they appeared to be. There is no claim that the bank did not have ample opportunity and ability to determine whether the bonds were genuine (and whether the purported copies were true) or whether there were circumstances casting doubt or suspicion in this respect. Before and after the bonds were admitted into evidence, the bank offered nothing to indicate the bonds were not true copies or to overcome the prima facie evidence the bonds provided; the bank did not contend that the bonds were forged, fraudulent, inapplicable to the subcontract, or altered, and pointed to no circumstances tending to cast doubt or suspicion on them. In sum, Trinity Bank's argument--both below and on appeal--appears to have been based on the theory that no rule specifically provided for admission of the bonds, and that the bonds should therefore be inadmissible regardless of evidence tending to indicate that such bonds existed and that these were the bonds in question. Because the language of Rule 901(a) is inclusive rather than limiting, we conclude that the bankruptcy court did not abuse its discretion by admitting the bonds into evidence.
 
 
 36
 For similar reasons, we likewise hold that no abuse of discretion arose from the admission of the photomechanical duplicates of the bonds. The bank made no showing that admission of duplicates in lieu of the original bonds was unfair, and, to the limited extent that Trinity Bank raised any truly "genuine question as to the authenticity" of the duplicates, the bank made no claim that the duplicates did not fairly reproduce the originals, and the bank offered no evidence to overcome the authenticating effect of the Receiver's certificate as to the accuracy of the duplicates. See Fed.R.Evid. 1003.[10]
 
 C. Coverage of the bonds
 
 37
 Trinity Bank contends the seven pairs of bonds evidence only a single obligation exposing the surety to a maximum possible liability of $267,000. Accordingly, the bank argues, since the surety received $217,558.19 from the collateral securing its bonds, see note 3, supra, Eastern Indemnity should be entitled to recover at most only an additional $49,441.81. Appellant bases this "overlapping bonds" interpretation on the fact that all the bonds are for the same amount and reference the same subcontract, and the bank asserts that "[b]ecause the originals of the bonds were not submitted, each of the bonds clearly appear[s] to be a duplicate obligation of the others."[11] Appellant makes no effort to explain why each pair of bonds referenced a different "phase" of the subcontract, how overlapping bonds providing only $267,000 coverage would be acceptable to the project contractor, who required full bonding, or why the bonds were issued in an amount that reaches the full subcontract value only if they are treated as cumulative.
 
 
 38
 This argument merits short shrift. We deem the conclusion that the bonds provided cumulative coverage to be a finding of fact, and we hold that it was not clearly erroneous.
 
 III.
 
 39
 Having concluded that appellant's contentions lack merit, we affirm.
 
 
 40
 AFFIRMED.
 
 
 
 [1]
 Cowan was not subject to subpoena because he resided beyond the subpoena jurisdiction of the court. His deposition testimony, read into the record of the bankruptcy court proceeding, was that forms of another bonding company (Safeco) were used to prepare the "contractor's questionnaire" submitted along with other financial information, but that both he and Bill Jones concluded early on that Eastern Indemnity was the most likely company to bond the subcontract--if not the only company that would do so--because of its willingness to provide bonds for those with less-than-perfect financial histories and because Mr. Boggs had, in the past, experienced financial problems that resulted in an earlier bankruptcy
 
 
 [2]
 Each bond referred to a specific "phase" ("A" through "G") and each referenced one part of the project such as the "East Tower," "South Tower," or "B area." The performance bond for each phase was paralleled by a payment bond for the same phase. Although each bond was in the amount of $267,000, the surety's exposure was only the total of the face amount of seven bonds, because the surety could not be called to pay in full on both a performance and a payment bond covering the same phase: If Boggs did not perform one phase of the subcontract, the surety's performance bond for that phase might be called on, but no subcontractors of Boggs would be left unpaid for that phase; conversely, if Boggs completed a phase but did not pay its subcontractors for their work on that phase, only a payment bond and no performance bond would be involved. The bankruptcy court regarded each pair of bonds as covering a separate part of the subcontract but all the bonds together as covering the entire subcontract
 
 
 [3]
 Eastern Indemnity also paid a claim of $135,557 to one of Boggs' suppliers but had recovered this sum in full through the collateral it held as security for the bonds. Together with the $82,001.19 recovered from this same collateral and tendered by the Trustee towards the surety's claim based on the Wigley settlement, Eastern Indemnity received back $217,558.19 of the $315,557 it had disbursed, leaving a balance of $97,998.81 paid out on behalf of Boggs but not reimbursed
 
 
 [4]
 The precise amount of the fund is the original $90,000, less administrative expenses of the bankruptcy estate, plus interest earned on the balance
 
 
 [5]
 Similarly, Trinity Bank contests the bankruptcy court's finding that Stiegler had apparent authority to subordinate the bank's priority but fails to address Insurance Co. of North America v. Fredonia State Bank, 469 S.W.2d 248 (Tex.Civ.App.--Tyler 1971, writ ref'd n.r.e.) (holding that a bank may be estopped from denying the apparent authority of one who serves as its executive vice president)
 
 
 [6]
 See also id. Secs. 1-18 (discussing in greater depth the doctrine as applied in Texas); Fretz Construction v. Southern National Bank, 626 S.W.2d 478 (Tex.1981) (enforcing on promissory estoppel principles a promise that was both unconditional and without consideration and that was extended by a bank's vice president in a letter to a construction company's prospective surety, who relied upon the letter in deciding to issue payment and performance bonds); Fredonia State Bank, supra, at 253 (recognizing estoppel based on bank officer's conduct); Preload Technology v. A.B. & J. Construction Co., Inc., 696 F.2d 1080, 1084-85 (5th Cir.1983)
 
 
 [7]
 We also believe that even if there were technically no contract, section 510(a) can be understood to extend to a promise which is made enforceable by the doctrine of promissory estoppel, at least to the extent necessary to prevent reliance losses of the kind involved here. See Wheeler v. White, 398 S.W.2d 93 (Tex.1965); Preload Technology, 696 F.2d at 1088, 1094-95
 
 
 [8]
 Article 21.28 addresses the liquidation, consolidation, or rehabilitation of insurance companies, and provides special rules to facilitate the administration of such procedures. Subsection 11 thereof provides:
 "(a) Records Admitted. All books, records, documents and papers of any delinquent insurer received by the liquidator and held by him in the course of the delinquency proceedings, or certified copies thereof, under the hand and official seal of the Board and/or liquidator, shall be received in evidence in all cases without proof of the correctness of the same and without other proof, except the certificate of the Board and/or liquidator that the same was received from the custody of the delinquent insurer or found among its effects.
 "(b) Certificates. The liquidator shall have the authority to certify to the correctness of any paper, document or record of his office, ... and to make certificates under seal of the Board ... certifying to any fact contained in the papers, documents or records of the Liquidation Division; and the same shall be received in evidence in all cases in which the originals would be evidence.
 "(c) Prima-facie Evidence. Such original books, records, documents and papers, or certified copies thereof, or any part thereof, when received in evidence shall be prima-facie evidence of the facts disclosed thereby."
 Texas cases construing this provision include Bouknight v. Langdeau, 333 S.W.2d 670 (Tex.Civ.App.--Austin 1959), aff'd, Langdeau v. Bouknight, 162 Tex. 42, 344 S.W.2d 435 (1961).
 
 
 [9]
 We note that prior to the adoption of the Federal Rules of Evidence, Fed.R.Civ.P. 43(a) provided that evidence was admissible in federal court if it was admissible under any one (or more) of three alternate tests, viz: (1) a federal statute; (2) federal equity practice; (3) "under the rules of evidence applied in the courts of general jurisdiction of the state in which the United States court is held." 10 J. Moore, Moore's Federal Practice Sec. 400.12, , , (2d ed. 1985). It is commonly understood that the Federal Rules of Evidence, except where they expressly state some specific exclusionary rule (and none such is involved here), favor admissibility of evidence in civil cases at least as much as did former Fed.R.Civ.P. 43(a). See Moore, supra Sec. 401.02. It would seem anomalous if records of this sort which were admissible in federal civil cases in Texas prior to the Federal Rules of Evidence were now required to be excluded in such cases despite the absence of specific provision in the Rules mandating such a result. While we do not decide whether the Texas statute is necessarily and rigidly controlling, see note 10, infra, the above considerations support our holding that it is something the bankruptcy court properly took significantly into account in admitting the documents under the present circumstances
 
 
 [10]
 We also observe that Fed.R.Evid. 302 requires a federal court to apply State law to determine "the effect of a presumption respecting a fact which is an element of a claim or defense as to which State law supplies the rule of decision." See 21 C. Wright & K. Graham, Federal Practice and Procedure: Evidence Sec. 5136, at 671-72 (1977) (analyzing Rule 302 in relation to state statutes providing for the authentication of documents not otherwise admissible under the Federal Rules of Evidence); id. at 672 (concluding that "in cases of conditional relevance under Rule 104(b), the state presumption [of a document's authenticity] should be applied"). Though the foregoing analysis of Rule 302 is supportive of the result we reach, we do not here determine whether to adopt that analysis as a broad, inflexible rule overriding truly questionable circumstances or the trial court's discretion
 
 
 [11]
 We view this statement as asserting that multiple but different bonds were issued on the same $267,000 obligation, rather than as asserting that every payment bond, for example, was merely a copy of one original payment bond. Examination of the copies in evidence clearly indicates that the latter is not the case