### In re TERRACE GARDENS PARK PARTNERSHIP f/d/b/a Terrace Gardens Office Park, Debtor.

### Bankruptcy No. 87–30855.

United States Bankruptcy Court,
W.D. Texas,
El Paso Division.

Jan. 6, 1989.

   (1) that occurs after the commencement of the case; and
   (2) ...
   (B) that is not authorized under this title or by the court.
11 U.S.C. § 549(a).

Leslie M. Luttrell, Hagans Ginnings Birkelbach Keith & Delgado, El Paso, Tex., for debtor.

Harrel L. Davis, III, Grambling & Mounce, El Paso, Tex., for El Paso Federal Sav. & Loan Ass'n.

Jeanette James, Hardie, Hallmark, Sergent, Hardie & Langford, El Paso, Tex., for Texas Nat. Bank.

## MEMORANDUM OF OPINION

LEIF M. CLARK, Bankruptcy Judge.

At El Paso, Texas came on for hearing the Motion of El Paso Federal Savings & Loan Association ("EPF") for Relief from Stay and the Applications of the Debtor to sell two of the six office buildings comprising Terrace Gardens Office Park. EPF holds an uncontested first lien on the office park to secure an original construction loan of $2,200,000, and filed objections to both applications to sell. Texas National Bank ("TNB") holds a second lien to secure a loan of $400,000. The debtor had exhausted the construction loan from EPF but the buildings were not yet completed, necessitating the second loan from TNB. As EPF had already committed to permanent financing on the project, but would not (or could not) loan anything beyond the original $2.2 million, it consented to the second lien (waiving that provision in its construction loan agreement and deed of trust). What is more, it granted TNB the right to recover its $400,000 out of first proceeds from the sale or refinancing of all of the project or any one building thereof.

EPF and TNB mightily dispute the parameters of this voluntary partial subordination. TNB contends that any sale, even one to TNB, should result in its receipt of $400,000, relying on the testimony of TNB's president, George Elias, the letter agreement of June 2, 1986 (TNB Exhibit 1) and the acknowledgement letter of October 30, 1987 from counsel for EPF (TNB Exhibit 2). EPF contends that only sales to third parties qualify TNB to receive its proceeds, per the original letter agreement of June 2, 1986 (TNB Exhibit 1). EPF argues that the proposed exception which would have allowed TNB to purchase Building Four in the fall of 1987 (TNB Exhibit 2) for a variety of reasons evaporated, either because of a failure of a condition precedent (e.g., closing before November 3, 1987) or because of a failure to reach a meeting of the minds (see Petitioner's Exhibit 10, a letter from TNB's counsel contesting EPF's counsel's characterization of one of the material terms).

The debtor proposes to sell Building Four to Texas National Bank for $545,000, $145,000 in cash and the balance by way of a credit on the TNB debt. The other building is to be sold to Western Energy, Inc. for $567,324. The debtor contends that the sales afford adequate protection to EPF and render nugatory EPF's motion to lift stay. EPF objects to the sale of Building

Four to TNB unless the entire $545,000 is paid in cash. TNB responds that it will not buy Building Four unless it can use its debt cancellation as part of the consideration. EPF has withdrawn its objection to the sale of Building Six on condition it receive all of the proceeds. TNB has no objection to the sale of Building Six on the conditions EPF has imposed provided it is permitted to buy Building Four on *its* terms. Otherwise, it wants the first $400,000 of any proceeds received from the sale of Building Six.

An obvious solution to the conundrum presented is to authorize *both* sales, overruling both objections and recognizing TNB's entitlement to payment out of first proceeds of a sale from a third party. In this way, TNB would receive $400,000 cash from the sale of Building Six which it would then apply to the purchase of Building Four, ending up in the same economic position without this court's having to decide all of the issues raised in the dispute outlined above.

EPF legitimately argues that, while it contracted to a release price of $545,000 on Building Four, the release price on Building Six was to be $630,000, so it would not be placed in the same economic position. However, EPF *was* willing to sell Building Six for $567,324 *if* it got all the proceeds. If a third party other than TNB offered to buy Building Four for precisely what TNB is offering, the first $400,000 would undoubtedly go to TNB. Thus, EPF would *also* be placed in the same economic position for which it had contracted, with only the technicality of the name of the purchaser of Building Four about which to complain.

By agreement of the parties, the Motion and the two Applications were heard together, as the issues are integrally related. This opinion constitutes the court's findings of fact and conclusions of law.

## FINDINGS OF FACT

1. Terrace Gardens Park Partnership, the debtor in this case, filed for bankruptcy under Chapter 11 of Title 11 of the United States Code on or about November 3, 1987, forestalling foreclosure by EPF.

2. EPF has a valid first lien upon the property the subject of its Motion for Relief from Stay, securing an uncontested indebtedness of $2,336,016 as of filing.

3. TNB has a valid second lien on the same property, securing an indebtedness of approximately $418,000.

4. The property has a value, for purposes of this hearing, of $2,500,000.00. The only appraisal testimony was that of EPF's expert, Charles Duke.[1] He valued the entire complex at between $2,150,000 and $2,350,000 (or approximately $86.00 per square foot). However, his income approach was flawed by a reliance on the actual leases in place as opposed to the leases which a prospective purchaser could reasonably expect to obtain. *See In Re Cool,* Bankr. (Bankr.D.Mont.1987). Further, his market data apparently failed to adequately account for the construction of an upscale mall nearby, nor did it include the contract TNB had placed on one of the office park's buildings amongst its comparable sales.

The debtor's general partner predictably valued the project at more than $3,000,000. However, the same witness also solemnly testified that he could achieve 90% occupan-

[1]. Mr. Duke had not prepared a formal written appraisal in time for the hearing. However, he did have an informal memorandum which contained most of the information necessary for him to have formed an opinion as to value. This procedure conforms with the most recent enactment of the Code of Ethics promulgated by the Society of Real Estate Appraisers. It is also less expensive to the clients and facially easier for a court familiar with appraisal technique to digest. The only defect in the memorandum was the lack of any description of the assumptions upon which the appraiser relied. Mr. Duke testified at the hearing that the appraisal assumed a sale of the complex in bulk, as opposed to a piecemeal sale of the buildings. That assumption was not detailed in his memorandum, though it could reasonably have been divined. The memorandum also said nothing about the fact that office park was subject to a condominium regime, or that a new upscale mall is currently under construction nearby. In the opinion of this court, this memorandum just barely complies with the requirements of the ethical rules.

cy by the end of this year and submitted projections of future performance which could only be charitably characterized as wishful. An appraisal obtained by the debtor more than a year ago placed the value at about $2,580,000.[2]

If TNB had not advanced the additional $400,000 to finish the buildings, they would be worth considerably less than $2.2 million. Their value is further enhanced by their being sold individually than as a single office park.

The business of valuation has been described as as much art as technique. While valuation is a necessary component of the bankruptcy process, its utility has too often been overstated. Certainly it helps a court with risk allocation in the context of evaluating sales, plans, and requests for relief from stay. But it is sheer arrogance for any bankruptcy court to maintain that it can, in the space of a few hours of hearing testimony, actually *set* values with binding collateral estoppel or res judicata effect. This "valuation" is made with a full appreciation of the limitations inherent in the valuation process. It will here function as a guidepost, a tool for the larger task of risk allocation which stands at the root of Bankruptcy Code.

5. On June 2, 1987, TNB and EPF agreed that TNB would loan the debtor the additional $400,000 to complete construction of the Terrace Gardens Office Park, in consideration of EPF's commitment "that your loan shall be repaid from the first funds available from the Project as provided in this letter, and that you will secure this loan, in part, by placing a second lien on the entire Project, subject only to our first lien position." (TNB Exhibit 1).

6. The letter agreement of June 2, 1987 contemplated the repayment from first funds upon either the sale of the buildings in the project to a third party or refinancing by another lender, at preset release prices ($630,000 for Buildings 1, 5 or 6 and $545,000 for Buildings 2, 3 or 4).

7. But for the loan from TNB, the project could not have been finished, to the substantial detriment of EPF and the value of its collateral.

8. EPF has consented to the piecemeal sale of its collateral. Its deed of trust contemplated release prices from the very beginning. Its agreement with TNB contemplated the sales of one or more buildings. Its agreement with the borrower, attached as an exhibit to its objection to the sale of Building Six, notes a renegotiated release price formula and a procedure for selling off buildings individually. This court fails to be persuaded by EPF's strenuous remonstrations that office park must be sold in bulk. This is not a finding that EPF has consented to the sale of its collateral within the meaning of Section 363(f)(2), however.

9. EPF *has* consented to the sale of Building Six provided it receives all of the proceeds from that sale.

10. TNB has consented to the sale of Building Four provided it does not have to pay more than $145,000 of its own cash for it.

11. Based upon the total square footage of 29,835 square feet specified in EPF's documents, the ratio of the original construction loan to the square footage of the office park was $73.73 per square foot. When EPF agreed to TNB's new loan of $400,000, it developed a new release price which assumed a sale of one of the buildings per its letter agreement with TNB dated July 2, 1987. This new release price comes out to $84.29 per square foot. The original deed of trust received and recorded by EPF from the debtor specified a release price of *$99.38* per square foot. *See* Petitioner's Exhibit 3 at page 10 (paragraph 30(d)).

12. The sale price of Building Six includes a credit to the buyer for $36,000 worth of finish-out to be completed by the buyer. The sales price is $102.00 per square foot.

13. The sales price of Building Four is consistent with the sales price specified in the letter agreement of June 2, 1987. The

---

**2.** Neither this appraisal nor its author were produced at the hearing.

price will yield in excess of $125.00 per square foot.

14. The debtor should be able to promulgate a plan of reorganization within a reasonable period of time.

15. The plan proposes a controlled liquidation over approximately one year. In the interim, net rentals from the office complex would be applied toward the amortization of EPF's loan.

16. If these sales are consummated, EPF's remaining indebtedness would be approximately $1,780,000.00.

17. The current market for office buildings is soft and flat. However, these office buildings are well-situated in a scenic area and will soon have an upscale shopping mall as a new neighbor.

18. The debtor has a number of unsecured creditors in addition to the secured creditors participating in this proceeding.

19. The debtor is current on both insurance and property taxes.

20. The two buildings proposed to be sold represent one-third of the debtor's total assets.

21. If Building Six is not sold, the debtor will lose not only a buyer but a tenant, to the detriment of the estate.

22. The proposed sale price for Building Six exceeds the value of the building and the liens against the building.

23. If the stay is lifted and EPF forecloses, TNB's rights under the letter agreement of June 2, 1987 will be eliminated.

### CONCLUSIONS OF LAW

1. This court has jurisdiction over this core proceeding pursuant to 28 U.S.C. § 157(b).

2. EPF has successfully established that there is no equity in the subject property for purposes of 11 U.S.C. § 362(d)(2)(A). As this court has noted above, valuations serve principally to guide the court in the process of risk allocation. They should not be taken either by this or any other court to be binding determinations of actual value so much as indications of value for purposes of evaluating the relative merits of a proposed course of action under the Bankruptcy Code, such as granting or denying a creditor relief from stay or authorizing a debtor's sale of some of its property.

3. The debtor has established a reasonable likelihood of reorganization within a reasonable time. The debtor proposes a liquidation plan on a time frame consistent with the holding period to be expected for a project of this type. The application of net operating income toward amortization of the secured debt in the interim is consistent with Section 1129(b)(2)(A)(ii), assuming sufficient income and an acceptable discount rate.

This court has previously held that it is appropriate for a bankruptcy court to rule on the merits of a debtor's potential for reorganization very early in a case. *Anderson Oaks (Phase I) Limited Partnership,* 77 B.R. 108, 110 (Bankr.W.D.Tex. 1987); *see United Savings Association of Texas v. Timbers of Inwood Forest Associates,* 484 U.S. 365, 108 S.Ct. 626, 633, 98 L.Ed.2d 740 (1988). In *Anderson Oaks,* this court concluded that a plan which contemplated negative amortization for at least six years, forcing an involuntary loan out of an already undersecured creditor, could not be confirmed because it would not pass muster under the feasibility test of Section 1129(a)(11). More importantly, confirmation could never be achieved because the debtor lacked a class of unimpaired creditors and so could not satisfy the requirements of Section 1129(a)(10).

That case does not depart from the standard espoused by numerous other courts and most recently picked up by the Supreme Court in the *Timbers* case. Section 362(d)(2) obligates the debtor to make, in the words of the Supreme Court, "not merely a showing that if there is conceivably to be an effective reorganization, this property will be needed for it; but that the property is essential for an reorganization *that is in prospect.* This means, as many lower courts, including the *en banc* in this case, have properly said, that there must be 'a reasonable possibility of a successful reorganization within a reasonable time.'

[In re Timbers of Inwood Forest Associates Ltd.] 808 F.2d at [363] 370–371, and nn. 12–13 [5th Cir.1987], and cases cited therein." *United Savings Association of Texas v. Timbers of Inwood Forest Associates*, 108 S.Ct. at 632 (emphasis in original).

■ In *Anderson Oaks*, there was no reorganization in prospect. In this case, there is, though it is slim. Courts should be somewhat disinclined to conduct full-blown confirmation hearings in the context of stay litigation, lest the inherently interim function of Section 362 be overlooked. There are indeed situations in which a fully developed hearing on likelihood of reorganization will require the equivalent of confirmation evidence, and courts should not be shy about entertaining such evidence where appropriate, especially in light of the Supreme Court's directive. At the same time, determining a reasonable possibility of reorganization of an effective reorganization within a reasonable period of time in general requires a lower quantum of evidence than does actual confirmation under Section 1129(a). So long as that reasonable possibility has been established, the stay should remain in place (though perhaps its continuation should be conditioned on the debtor's confirming a plan by a court-set deadline).

4. The sale of these two buildings free of liens is authorized under Section 363(f)(3) of the Bankruptcy Code.[3] There is a split of authority over the interpretation of the phrase "... greater than the aggregate value of all liens on such property" found in subsection (f)(3). Some courts have held that, to fall within the provision, a proposed sale must yield something more than the aggregate of the *debts* asserted to be secured by the liens. *See, e.g., Matter of Stroud Wholesale, Inc.*, 47 B.R. 999 (E.D.N.C.1985), *aff'd sub nom., Richard-son v. Pitt County*, No. 85–1422 (4th Cir. Jan. 21, 1986); *In re Red Oak Farms, Inc.*, 36 B.R. 856 (Bankr.W.D.Mo.1984); *In re Bobroff*, 40 B.R. 526 (Bankr.E.D.Pa.1984); *In re Murphy*, 34 B.R. 78 (Bankr.D.Md. 1983); *Matter of Riverside Investment Partnership*, 674 F.2d 634 (7th Cir.1982). Other courts, along with *Collier*, maintain that a sale price need only exceed the *value* of the property, relying on the definition of a secured claim in Section 506(a), which equates such a claim to the value of the collateral securing the claim. *In re Beker Industries Corp.*, 63 B.R. 474 (Bankr.S.D. N.Y.1986); *Matter of Rouse*, 54 B.R. 31 (Bankr.W.D.Mo.1985); *In re Hatfield Homes, Inc.*, 30 B.R. 353 (Bankr.E.D.Pa. 1983); 11 U.S.C. § 506(a) ("an allowed claim of a creditor secured by a lien on property ... is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property ..."); *see also* 2 *Collier on Bankruptcy* para. 363.07 at pp. 363–31 *et seq.* (15th ed. 1987); *cf. United Savings Association of Texas v. Timbers of Inwood Forest Associates*, 484 U.S. 365, 108 S.Ct. 626, 630–31, 98 L.Ed.2d 740 (1988); *Wright v. Union Central Life Insurance Co.*, 311 U.S. 273, 61 S.Ct. 196, 85 L.Ed. 184 (1940).

There are problems with both interpretations. Focusing solely on the amount of the debt securing the liens as does *Red Oak Farms* ignores the Code's focus on protecting the *value* of collateral, thereby allowing an undersecured creditor to obstinately block an otherwise sensible sale. That result is also inconsistent with Section 363(k), which allows a secured creditor to bid in the amount of its debt anyway, to prevent a sale over its objection for less than what it is owed.[4] By the same token,

---

**3.** Section 363(f)(3) reads as follows:
(f) The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if—
(3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
11 U.S.C. § 363(f)(3).

**4.** Section 363(k) reads as follows:

(k) At a sale under subsection (b) of this section [which authorizes sales out of the ordinary course of business on notice and hearing] of property that is subject to a lien that secures an allowed claim, unless the court for cause orders otherwise the holder of such claim may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property.
11 U.S.C. § 363(k).

allowing a sale for the value of the collateral, as suggested in *Beker*, fails to give effect to the express language of the statute, which calls for the price to exceed the aggregate value of *all* liens on the property. *See* 11 U.S.C. § 363(f)(3); *see also Matter of Stroud Wholesale, Inc.*, 47 B.R. at 1001–02; *but see International Union v. Morse Tool, Inc.*, 85 B.R. 666 (D.Mass. 1988). Moreover, the generally held view is that sales out of the ordinary course of business should not be permitted unless the sale will produce equity. *Matter of Riverside Investment Partnership*, 674 F.2d at 640; *see 2 Collier on Bankruptcy*, para. 363.07 at pp. 363–32, 363–33 (15th ed. 1987).

■ This court believes that *Beker* is the better reasoned view. Sections 361–364 all address the treatment of secured claims in a bankruptcy case. All four sections employ the common concept of adequate protection as the touchstone for whether a debtor's proposed action should be approved. Adequate protection in turn focuses on the value of the collateral securing the claim.[5] So long as a creditor's interest is adequately protected, the debtor is permitted to sell property of the estate. 11 U.S.C. § 363(e). It makes no sense to read into Section 363(f)(3) a restriction inconsistent with the adequate protection scheme which pervades both Section 363 and the rest of the Code, just because the sale is free of liens, especially as the commonly accepted method for adequately protecting a secured creditor when a sale is authorized under Section 363(f) is to order the liens to attach to the proceeds of the sale. H.R.Rep. No. 595, 95th Cong, 1st Sess 345 (1977), U.S.Code Cong. & Admin.News 1978, p. 5787; *see 2 Collier on Bankruptcy*, para. 363.07 at p. 363–31 (15th ed. 1987).[6] In any event, a secured creditor who disagrees with the proposed price has recourse to Section 363(k), which permits it

to bid in its lien (just as it might at a foreclosure sale) to head off the sale.

The two buildings in question here are each proposed to be sold for a value per square foot considerably in excess of the value found by the court. Building Six, to be sold for $567,324.00, will generate $102 per square foot. Building Four, to be sold for $545,000, will generate $124.15 per square foot. The total value of $2,500,000 found by the court comes out to $83.79 per square foot. Even considering the caution with which this court approaches the valuation process (see discussion *supra*), the sales here proposed satisfy the requirements of Section 363(f)(3).

5. Even though a sale will yield a price equal to or exceeding the value of the property, it may only be approved after examination of the surrounding circumstances and a finding by the court that those circumstances justify the sale. As the *Beker* court noted:

> Because of the vagaries of the valuation process ... the proper exercise of discretion would require that those circumstances be compelling and that it be found ... that "the proposed sales price is the best price obtainable under the circumstances of a particular case ..."
> 30 B.R. at 355.

*In re Beker Industries Corp.*, 63 B.R. 474, 477 (Bankr.S.D.N.Y.1986). Whether the circumstances in question will justify a sale will turn at least in part on what chapter the case is filed under. Where a trustee in a chapter 7 case may have no justification whatsoever for selling rather than abandoning fully encumbered property, *see, e.g., In re K.C. Machine & Tool Co.*, 816 F.2d 238, 246 (6th Cir.1987), the debtor-in-possession in a chapter 11 proceeding might need to sell off some of its assets to "slim down" as part of the reorganization process preliminary to a plan. *See In re Lion-*

---

**5.** The phrase "value of such creditor's interest" in § 506(a) means "the value of the collateral." [citations omitted]. We think the phrase "value of such entity's interest" in § 361(1) and (2), when applied to secured creditors, means the same. *United Savings Association of Texas v. Timbers of Inwood Forest Associates*, 484 U.S. 365, 108 S.Ct. 626, 630, 98 L.Ed.2d 740 (1988). This

analysis suggests that the Supreme Court would apply a similar interpretation to the expression "value of all liens on the property" found in Section 363(f)(3).

**6.** The proceeds are in turn buffered by the restrictions of Section 363(c) on the debtor's use of cash collateral. 11 U.S.C. § 363(c).

el Corp., 722 F.2d 1063, 1071 (2d Cir.1983); In re Continental Air Lines, Inc., 780 F.2d 1223, 1226 (5th Cir.1986); see also Matter of Baldwin United Corp., 43 B.R. 888, 905–06 (Bankr.S.D.Ohio 1984). In the words of the court in Continental, "there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business." In re Continental Air Lines, Inc., 780 F.2d at 1226.

Of course, in evaluating the business justification for a debtor's proposed sale outside the ordinary course of business, the court must be mindful of the potential for evasion of the formal requirements for approval of plans of reorganization. To the extent that piecemeal sales of the debtor's assets may represent a "creeping plan of reorganization," creditors' rights under the various Code sections associated with the promulgation of plans might become meaningless. The Continental decision offers some guidance:

"Undertaking reorganization piecemeal pursuant to § 363(b) should not deny creditors the protection they would receive if the proposals were first raised in the reorganization plan. See In re Allison, 39 B.R. 300, 303 (Bankr.D.N.M. 1984). At the same time, we fully appreciate that post-petition, pre-confirmation transactions outside the ordinary course of business may be required and that each hearing on a § 363(b) transaction cannot become a mini-hearing on plan confirmation. Balancing these considerations, we hold that when an objector to a proposed transaction under § 363(b) claims that it is being denied certain protection because approval is sought pursuant to § 363(b) instead of as part of a reorganization plan, the objector must specify exactly what protection is being denied. If the court concludes that there has in actuality been such a denial, it may then consider fashioning appropriate protective measures modeled on those which would attend a reorganization plan.

In re Continental Air Lines, Inc., 780 F.2d at 1227–28.

■ At trial, EPF raised this issue, but failed to particularize what protections were being denied, other than that the sales if approved would eliminate any realistic possibility of selling the balance of the buildings as a unit. As noted above, the evidence and the exhibits attached to EPF's pleadings indicate that EPF has already restructured the financing in express contemplation of piecemeal sales of the buildings. The appraiser testified that the total collateral package would probably fetch more if sold individually, all other things being equal. No further sales are contemplated prior to approval of a plan, though the proposed plan will feature liquidation of the balance of the collateral. While the sales are expected to complement a proposed plan, the transactions do not specify particular terms for adopting a reorganization plan. See In re Continental Air Lines, Inc., supra at 1226. EPF has failed to carry the burden imposed in the Continental case.

In any event, there are legitimate business justifications for the sales in question. The sales will eliminate one secured creditor and substantially reduce the claim of another, easing the interim debt service required under the debtor's proposed plan. As the plan contemplates orderly liquidation in any event, taking advantage of immediate sales at favorable prices aids that process. What is more, in a "soft and flat" real estate market such as El Paso's (as the appraiser described it in his testimony), sales such as these are "birds in the hand" which prudent business judgment dictates be preferred to the two in the bush on the other side of confirmation. Considering "all salient factors pertaining to the proceeding and, accordingly, [acting] to further the diverse interests of the debtor, creditors and equity holders, alike," this court is satisfied that the sales in question are justified. In re Lionel Corp., 722 F.2d 1063, 1071 (2d Cir.1983); Matter of Baldwin–United Corp., 43 B.R. 888, 906 (Bankr.S.D.Ohio 1983).

Arguably, a somewhat stricter standard should be applied to sales under Section 363(b) when they also fall under Section 363(f). After all, it is one thing simply to sell some of an estate's assets. It is quite another to sell those same assets free of the liens which encumber them. The Bek-

*er* court required a showing of special or compelling circumstances to authorize such a sale, commenting that "[since] property in which there is no equity for the general estate 'in practical essence ... belongs[s] to the secured creditors,' [citation omitted], they, absent compelling circumstances, should sell it themselves if they object to the sale." *In re Beker Industries Corp.*, 63 B.R. at 477–78. The difficulty with this test is that it tends to ignore the difference between chapter 7 and chapter 11 proceedings. Simply put, fully encumbered property in a chapter 11 proceeding does *not* in practical essence belong to the secured creditors. During the pendency of the case, the debtor-in-possession is afforded the right to operate its business, and to make the difficult management decisions associated with rehabilitating the debtor preliminary to the promulgation of a plan. *See* 11 U.S.C. § 1107(a). Greater flexibility should be afforded debtors in chapter 11 cases to effectuate the reorganization goals of that chapter. *See* H.R.Rep. No. 595, 95th Cong, 1st Sess 220, 224 (1977):

> The purpose of a business reorganization case, unlike a liquidation case, is to restructure a business's finances so that it may continue to operate, provide its employees with jobs, pay its creditors, and produce a return for its stockholders. The premise of a business reorganization is that the assets that are used for production in the industry for which they were designed are more valuable than those same assets sold for scrap.... If the business can extend or reduce its debts, it often can be returned to a viable state....

*Id.* at 220, U.S.Code Cong. & Admin.News 1978, p. 6179.[7]

7. In the proposed draft bankruptcy law submitted along with the Report of the Commission on the Bankruptcy Laws of the United States in 1973, two separate statutes were proposed relating to sales free of liens. Report of the Commission on the Bankruptcy Laws of the United States, H.R.Doc. No. 93–137, 93rd Cong., 1st Sess., Pt. II (1973), *reprinted in Collier on Bankruptcy*, Appendix Volume 2 (15th ed. 1987). Section 5–203(b) authorized sales free of liens by a trustee in the liquidation of a case only if "(1) there is an apparent equity of (2) the validity of the lien or other interest encumbering the property is in dispute." *Id.*, Section 5–203 at p.

A court in evaluating a proposed sale free and clear of liens must balance the need for flexibility with the competing concern of the affected creditors for adequate protection. Obviously, there is potential for abuse concerning which the court must be mindful. For example, a debtor should not be permitted to use Section 363(f) to "cash out" a creditor, depriving the creditor of its election rights under Section 1111(b), without a showing of compelling circumstances. Nor should a debtor be permitted to avoid the obligation to make full disclosure and to pass muster under Section 1129(a) by way of a "creeping plan" via a series of sales, abandonments, or the like. Collusive sales should also receive closer scrutiny, because of the substantial potential for abuse. By the same token, a creditor, intent on foreclosure may have little about which to complain if the proposed sale achieves results comparable to what the creditor could expect to achieve, assuming it is the successful bidder at the foreclosure and subsequently sells the property for its own account.

These are all merely some of the factors which a court might desire to consider. Each case will turn on its facts. However, core considerations will include determining whether, after evaluating the relative risks (including the risk that the appraisal testimony may be flawed, skewed, or otherwise suspect), the value of the creditor's lien rights in the property are adequately protected. *In re Beker Industries Corp.*, 63 B.R. 474, 477–78 (Bankr.S.D.N.Y.1986). Also, of course the court will have to satisfy itself that the price offered is "the best price obtainable under the circumstances of a particular case." *In re Hatfield Homes, Inc.*, 30 B.R. 353, 355 (Bankr.E.D.Pa.1983).

191. Section 7–205 authorized sales of all or substantially all of the estate's assets if approved by the administrator of a reorganization case. *Id.*, Section 7–205 at p. 239. In the accompanying note, the Commission commented that "there is a split of authority in the case law presently, with some courts allowing this type of sale, but others requiring some showing of emergency. This section makes it clear that a showing of emergency is not necessary." *Id.* The Commission recognized the varying policy considerations with respect to sales of property in liquidation and reorganization settings.

Finally, if the objecting party raises specific concerns relating to the manner in which the proposed sale tends to deprive it of rights to which it would otherwise be entitled as part of the reorganization process, the court should carefully examine those concerns and, if appropriate, fashion appropriate protections. *In re Continental Air Lines Corp.*, 780 F.2d 1223, 1228 (5th Cir. 1986).

■ 6. In evaluating the offer of TNB to purchase Building Four, the court must give effect to the subordination agreement between TNB and EPF. 11 U.S.C. § 510(a).[8] EPF did in fact agree to subordinate its entitlement to the proceeds of sale if it received at least $545,000 on Building Four. TNB Exhibit One. All other things being equal, such subordination agreements, where found, are enforceable in bankruptcy as between the parties to the agreement as contractual obligations, regardless whether the subordination in question has been memorialized by a filing giving notice to third parties. *In re Smith*, 77 B.R. 624, 627 (Bankr.N.D.Ohio 1987) and cases cited therein. The court finds that the expression "sale to a third party" in the original letter agreement of June 2, 1987 was not a critical term designed to exclude TNB.[9] Even if it were, EPF agreed to waive insistence on that term in its letter of October 30, 1987. TNB Exhibit 2. It is true that the parties commenced to dicker over who would pay the closing costs. In fact, it was no doubt that disagreement which prevented the sale from closing prior to the bankruptcy filing (over which TNB had no control). The petition was filed the day before the scheduled foreclosure, so we will never know whether, absent the

filing, the differences might have been worked out and the sale consummated. The bankruptcy filing at the very least excused TNB from further performance under the agreement *Alabama Football, Inc. v. Wright*, 452 F.Supp. 182 (N.D.Tex. 1977), *aff'd*, 607 F.2d 1004 (5th Cir.1979).

The case at hand bears some of the factual characteristics of a recent Fifth Circuit decision affirming the applicability of Section 510(a) to pre-bankruptcy subordination agreements, both written and oral. *Matter of Bobby Boggs, Inc.*, 819 F.2d 574 (5th Cir.1987). There, a lender agreed to subordinate its first lien position to a bonding company to assure the completion of construction of a hotel which the bank was financing. Some question was raised over whether the various writings of the parties amounted to an enforceable contract, but the court was not deterred by such niceties. Said the court:

> We discern no clear error in the bankruptcy court's conclusion that a binding agreement existed. Even if no bilateral contract existed, the result below is nevertheless supported by the Bankruptcy Code's equitable subordination provision as well as by the recognition of promissory estoppel in Texas law and the applicability of that doctrine to the facts of this case.
>
> \* \* \* \* \* \*
>
> [footnote 7] We also believe that even if there were technically no contract, section 510(a) can be understood to extend to a promise which is made enforceable by the doctrine of promissory estoppel, at least to the extent necessary to prevent reliance losses of the kind involved

---

8. Section 510(a) provides as follows:
   (a) A subordination agreement is enforceable in a case under this title to the same extent that such an agreement is enforceable under applicable nonbankruptcy law.
   11 U.S.C. § 510(a).

9. This finding is supported by a fair reading of the contract itself. It makes no practical difference vis-a-vis the impact of the subordination agreement whether TNB or someone else offers $545,000 for Building Four, as the result to EPF is the same—it receives $145,000 net in cash and the balance is paid over to TNB. The court can discern no peculiar economic benefit which EPF might be expected to realize from prevent-

ing TNB from itself paying the price specified in the agreement, unless the price structure was set up in a manner designed to exclude the possibility that EPF would ever have to honor the agreement (i.e., *no* third party in its right mind would think of paying $125.00 per square foot for any of the buildings in question). Such a reading is at variance with the testimony which indicated that TNB made the loan without an appraisal in reliance on the letter agreement and the accompanying conversations between officers of TNB and EPF. If this was EPF's intent, it should not in equity be given effect.

here. *See Wheeler v. White,* 398 S.W.2d 93 (Tex.1965); [*Preload Technology v. A.B. & J. Construction Co., Inc.,* 696 F.2d 1080, 1094–95 (5th Cir.1983)] *Matter of Bobby Boggs, Inc.,* 819 F.2d at 579, 579 n. 7. Here too, there are facts which tend to raise not only the written agreement found by the court, but also an oral agreement, and a promissory estoppel. Texas National Bank was induced into lending this money principally on its belief that it would get its money out of first proceeds of sale. Now, because of the bankruptcy, EPF is in a position to take advantage of the situation, perhaps hoping to obtain relief from the stay in order to foreclose TNB's second lien, but at the very least hoping to prevent its ever having to honor its original subordination agreement. TNB on the other hand realizes that, unless it can somehow trigger the subordination agreement, it may well be left out in the cold, having lent $400,000 in good faith only to lose it to a technicality. The subordination agreement must be given effect. If it is not, then TNB will certainly seek equitable subordination under Section 510(c)(1) in any event. *Bobby Boggs* suggests that even that formality may not be necessary. "Even if we were to conclude the bankruptcy court erred in finding a binding subordination agreement existed, which we do not, the result reached by that court nevertheless would be proper under the equitable subordination principle, rendering any such error harmless." *Matter of Bobby Boggs, Inc.,* 819 F.2d at 579; *see also In re Smith,* 77 B.R. 624, 626–27 (Bankr.N.D.Ohio 1987) (court gave effect to subordination agreement in awarding proceeds from the sale of crops during the bankruptcy case).[10]

10. In *Smith,* the proceeds in question were escrowed pending a determination of entitlement based upon the court's interpretation of the subordination agreement. The situation presented in this case does not afford the court that luxury. Only $145,000 in cash is being tendered by TNB. The balance is being paid via a "tender" of its claim to be paid $400,000. Should the court approve the sale only to subsequently overturn TNB's asserted rights under the subordination agreement, then the "consideration" received by EPF would only be $145,000 (the release of a second lien is of no value to EPF). EPF will not under such circumstances have

7. The parties have already agreed that reasonable expenses may be paid out of the proceeds of sale, including the brokerage commission of four percent which this court has previously approved. That agreement resolves the only issue which apparently prevented the parties from promptly closing this very transaction in November 1987. The court finds it appropriate to give effect to the extent possible to the intentions of the parties.

The foregoing constitute this court's findings of fact and conclusions of law. Findings may be treated as conclusions and vice-versa. An Order has been entered consistent with this opinion.

been adequately protected, but the sale will already have been consummated. TNB will not tender $545,000 in cash. The court is thus left with only two choices. It can reject the offer out of hand as too speculative because it requires the court to determine the subordination issue in order to evaluate whether the sale affords EPF adequate protection. Or it can proceed to evaluate the subordination agreement, and so rule on the sale itself as well. Considerations of judicial economy encourage the latter course of action, as the issue was developed at trial.