In re 80 NASSAU ASSOCIATES, 300 Gold Associates, 27–29 Thames Associates, Thames Realty Co., 41–43 John Associates, Debtors.

80 NASSAU ASSOCIATES, 300 Gold Associates, 27–29 Thames Associates, Thames Realty Co., 41–43 John Associates, Plaintiffs,

v.

CROSSLAND FEDERAL SAVINGS BANK, Defendant.

Bankruptcy Nos. 94 B 40792 (SMB) to 94 B 40796 (SMB). Adv. No. 94–8323A.

United States Bankruptcy Court, S.D.N.Y.

July 19, 1994.

Robinson Brog Leinwand Reich Genovese & Gluck, P.C. (Robert R. Leinwand, of counsel), New York City, for plaintiffs.

Herrick, Feinstein (Andrew C. Gold, of counsel), New York City, for defendant.

## MEMORANDUM DECISION AND ORDER DISMISSING THE COMPLAINT WITH LEAVE TO REPLEAD CERTAIN CLAIMS

STUART M. BERNSTEIN, Bankruptcy Judge.

In this adversary proceeding, the Debtors seek to subordinate the secured claim of the defendant, Crossland Federal Savings Bank ("Crossland"), to the claims of all other creditors,[1] and to transfer Crossland's mortgage to the Debtors' estates. According to the complaint, Crossland engaged in inequitable conduct which caused the Debtors to file their chapter 11 petitions. Specifically, they charge that Crossland, through statements it made, lulled them into the believing that if they paid certain real estate taxes and other expenses, Crossland would meet with the Debtors to discuss the restructuring of the mortgage obligations. Instead, after the Debtors (or third parties) paid these obligations and also provided certain financial information, Crossland filed a foreclosure action. This left the Debtors with no choice but to file their Chapter 11 petitions.

For the reasons discussed below, the Court holds that the Debtors have failed to allege either the type of conduct or injury that would warrant equitable subordination of Crossland's entire claim to the claims of all other creditors, and therefore, Crossland's motion to dismiss the complaint is granted. The Debtors are granted leave, however, to file an amended complaint to assert a claim for equitable subordination of Crossland's claim to the claim of Sutton Investment, to the extent that Crossland induced Sutton Investment to pay the Debtors' obligations.

### FACTS

According to the Complaint, each Debtor owns a building located in the City of New York. (Complaint at ¶ 4.) In or around June 21, 1988, the Debtors executed a mortgage note in the sum of $14,994,874.45 in favor of Crossland, secured by a mortgage on the five separate parcels, and a Consolidated Modification Extension Agreement (the "Agreement") in the sum of $16 million. (Id. at ¶ 9.) The Agreement provided for interest at the annual rate of 9.5% until July 1, 1993, at which point the entire principal obligation became due. (Id. at ¶ 12.)

Prior to the expiration of the Agreement, the Debtors faced cash flow problems, and attempted to renegotiate the Agreement. (Id. at ¶ 13.) Crossland assured the Debtors that if they continued to remain current on making tax and debt-service payments, Crossland would meet to discuss the renegotiation of the agreement prior the expiration date. (Id. at ¶ 14.) In reliance upon Crossland's assurances, the Debtors' principals paid, from their own funds, the "shortfall" in taxes due through July, 1993, (Id. at ¶ 15), and the Debtors furnished Crossland with detailed financial information concerning one of its general partners. (Id. at ¶ 16.)[2]

---

1. The *ad damnum* clause of the Complaint suggests that the Debtors are seeking to subordinate Crossland's claim not just to the payment of claims but also to the payment of interests, a result countermanded by the Bankruptcy Code. At oral argument of this motion, Debtors' counsel clarified the Debtors' position; they are seeking to subordinate Crossland's claim only to the payment of all other claims, including the payment of claims held by the Debtors' principals.

2. The Complaint is schizophrenic in identifying the persons that Crossland sought to induce to pay the taxes and other expenses. At one point, it alleges that Crossland, through promises of negotiation, sought to induce the Debtors to pay the taxes and other expenses. (Complaint ¶¶ 14, 17.) Elsewhere, however, the Complaint alleges that Crossland sought to induce payment from the Debtors' principals and Sutton Investment, an unsecured creditor. (Id. at ¶ 35.)

The same holds true regarding the identity of the payor. The Complaint alleges or implies, in several paragraphs, that the Debtors paid the taxes or expenses, or both, from their own funds. (Id. at ¶¶ 15, 26, 30 and 34.) At other times, the

Although the July 1993 due date came and went, Crossland did not take steps to foreclose its mortgage. Instead, in early 1994, when the next real estate tax installment became due, Crossland told the Debtors that if they paid the January 1994 installment, Crossland would meet with the Debtors within 30 days to renegotiate the agreement. (*Id.* at ¶ 17.) In reliance on Crossland's representation, the Debtors' principals—not the Debtors—paid the 1994 tax payment. (*Id.* at ¶ 18.) Further, and based upon Crossland's additional request, in January 1994, the Debtors furnished Crossland with projections for the next four years. (*Id.* at ¶ 19.)

Crossland still failed to schedule a meeting. (*Id.* at ¶ 18.) Instead, on February 9, 1994, as a new condition to meeting with the Debtors, Crossland requested, and the Debtors provided, additional financial information. (*Id.* at ¶ 20.) This information included financial statements for the previous six years and tax returns for the previous five years. (*Id.* at ¶ 21.)

Crossland then demanded that the Debtors meet with its representatives on February 10, 1994. To accommodate Crossland, one of the principals of the Debtors was forced to leave the hospital bedside of his critically ill wife. (*Id.* at ¶ 22.) Crossland, however, told the Debtors' principals, presumably on February 10, that it did not have time to review the information, and unless the Debtors' principals paid additional sums to Crossland, Crossland would not meet with the Debtors to renegotiate the Agreement. (*Id.* at ¶ 23.) Thus, although the Debtor sent Crossland all of the requested information, and their principals paid the July 1993 and the January 1994 taxes, "Crossland never participated in a meaningful discussion with the Debtors in order to renegotiate the Agreement." (*Id.* at ¶ 25.) "Crossland's failure to schedule and participate in a meaningful meeting with the Debtors caused the Debtors to be constrained to file their instant Chapter 11 petitions." (*Id.* at ¶ 26.)

Complaint states that the Debtors' principals made the payments from their own funds. (*Id.* at ¶¶ 18, 25 and 31.) Finally, the Complaint alleges that Sutton Investment paid the taxes and the expenses. (*Id.* at ¶ 36.) It is not clear whether this is purposeful or simply sloppy

In its only claim for relief, the Debtors seek to equitably subordinate Crossland's entire claim to all other claims (including insider claims), and to transfer Crossland's lien to the Debtors' estates. The Debtors charge that Crossland made misrepresentations, to wit, that if the Debtors paid the taxes and supplied the information, Crossland would meet with the Debtors to discuss the renegotiation of their Agreement. (*Id.* at ¶ 30.) In reliance upon these representations, the Debtors paid the July 1993 and January 1994 real estate taxes. (*Id.* at ¶ 34.) Further, notwithstanding these assurances, Crossland instituted its foreclosure action, which, in turn, caused the Debtors to file their Chapter 11 cases. (*Id.* at ¶ 31.)

The Complaint identifies three areas of wrongful or inequitable conduct. First, Crossland "manifested obdurate disregard for the Debtors' ability to continue operations after they requested the scheduling of a meeting, as well as a total disregard for the rights of the Debtors' unsecured creditors." (*Id.* at ¶ 33.) Second, Crossland "breached its duty of good faith by repeatedly assuring the general partners of the Debtors that if they and Sutton Investment, an unsecured creditor of the Debtor, used their funds for payment of taxes, it would schedule a meeting to discuss the Agreement." (*Id.* at ¶ 35.) Third, Crossland "imposed its will upon the Debtors and consequently received the unfair advantage of using another creditor's funds (Sutton Investment's) to protect its secured position with respect to the parcels." (*Id.* at ¶ 36.)

## DISCUSSION

### A. The Doctrine of Equitable Subordination

#### 1. Introduction

The doctrine of equitable subordination is codified in Section 510(c) of the Bankruptcy Code.[3] It empowers the Bankruptcy Court,

pleading, and the Debtors have not bothered to explain these inconsistencies.

3. The principles of equitable subordination are not set out in the Bankruptcy Code; instead Congress intended that they be defined by exist-

under "principles of equitable subordination," to subordinate, for purposes of distribution, claims to other claims, and interests to other interests, and to transfer the lien securing the subordinated claim to the estate.

■ The power to subordinate a claim derives from the Bankruptcy Court's general equitable power to adjust equities among creditors in relation to the liquidation results. *Bostian v. Schapiro (In re Kansas City Journal–Post Co.)*, 144 F.2d 791, 800 (8th Cir.1944). It involves viewing claims "through the eyes of equity and dealing with them on the basis of equitable considerations to prevent injustice or unfairness in the bankruptcy situation." *Id.*

■ The doctrine is limited to reordering priorities, and does not permit disallowance of claims.[4] *In re Mobile Steel Co.*, 563 F.2d 692, 699 (5th Cir.1977). It requires the court to consider whether,

> notwithstanding the apparent legal validity of a particular claim, the conduct of the claimant in relation to other creditors is or was such that it would be unjust or unfair to permit the claimant to share pro rata with the other claimants of equal status.

DeNatale & Abram at 419.

■ In considering the applicability of the doctrine, courts have uniformly applied the three-pronged test set forth in *Mobile Steel*:

> a) The claimant engaged in some type of inequitable conduct;
>
> b) The misconduct caused injury to the creditors or conferred an unfair advantage on the claimant;
>
> c) Equitable subordination of the claim is consistent with bankruptcy law.

*In re Mobile Steel*, 563 F.2d at 700; *accord In re Multiponics, Inc.*, 622 F.2d 709, 713 (5th Cir.1980); *In re Poughkeepsie Hotel Associates Joint Venture*, 132 B.R. 287, 292 (Bankr.S.D.N.Y.1991); *see generally* 3 Law-

rence P. King et al., *Collier on Bankruptcy* ("Collier") ¶ 510.05[2], at 510–9–10 (15th ed. 1994); DeNatale & Abram at 423.

## 2. Inequitable Conduct

■ Equitable subordination requires proof of "inequitable conduct" which, one commentator has noted, is a "very slippery concept with little predictive value." 2 David G. Epstein et al., *Bankruptcy*, § 6–93, at 256 (1992) ("Epstein"). It is not limited to fraud, *Heiser v. Woodruff*, 327 U.S. 726, 733, 66 S.Ct. 853, 856, 90 L.Ed. 970 (1946) (court can subordinate a claim in light of conduct that is "fraudulent or otherwise inequitable"); De-Natale & Abram at 423, and even includes lawful conduct that shocks one's good conscience:

> Inequitable conduct is that conduct which may be lawful, yet shocks one's good conscience. It means, *inter alia*, a secret or open fraud, lack of faith or guardianship by a fiduciary; an unjust enrichment, not enrichment by bon chance, astuteness or business acumen, but enrichment through another's loss brought about by one's own unconscionable, unjust, unfair, close or double dealing or foul conduct.

*In re Tampa Chain Co.*, 53 B.R. 772, 779 (Bankr.S.D.N.Y.1985) (quoting *In re Harvest Milling Co.*, 221 F.Supp. 836, 838 (D.Or. 1963); *accord Midlantic Nat'l Bank v. Borg–Warner Acceptance Corp. (In re Mayo)*, 112 B.R. 607, 650 (Bankr.D.Vt.1990); DeNatale & Abram at 424 n. 35).

■ Inequitable conduct which warrants subordination need not be related to either the acquisition or assertion of the claim. *Mobile Steel*, 563 F.2d at 700–01. The bankruptcy case is an integrated proceeding that concerns not only the legal validity of the claim but also claimant's right to share in the estate:

---

ing case law. S.Rep. No. 95–989, 95th Cong., 2d Sess. 74 (1978); 124 Cong.Rec. H11,095 (daily ed. Sept. 28, 1978) (statement of Rep. Edwards); Andrew DeNatale & Prudence B. Abram, *The Doctrine of Equitable Subordination as Applied to Nonmanagement Creditors*, 40 Bus.Law. 417, 421 (1985) ("DeNatale & Abram"). Hence, pre-Code cases interpreting the doctrine remain authoritative.

4. If the conduct of the creditor is so egregious that it affects the validity of the claim under applicable principles of law, the debtor can seek to disallow it as part of the claims allowance process. *See In re Mobile Steel Co.*, 563 F.2d 692, 699 n. 10 (5th Cir.1977).

For claim and distribution purposes, a bankruptcy proceeding is an integrated proceeding, and the "subject matter in litigation" in its practical aspect is the right of creditors to share in the bankruptcy assets themselves, not merely legally but in equitable relation to each other—for the assertion of a claim in bankruptcy is, of course, not an attempt to recover a judgment against the debtor but to obtain a distributive share in the immediate assets of the proceeding. The inequity which will entitle a bankruptcy court to regulate the distribution to a creditor, by subordination or other equitable means, need not therefore be specifically related to the creditor's claim, either in its origin or its acquisition, but it may equally arise out of any unfair act on the part of the creditor, which affects the bankruptcy results to other creditors and so makes it inequitable that he should assert a parity with them in the distribution of the estate....

*Kansas City Journal–Post,* 144 F.2d at 803–04; *accord Mobile Steel,* 563 F.2d at 700; DeNatale & Abram at 425.

Traditionally, equitable subordination did not apply to ordinary creditors. Like its parents—*Taylor v. Standard Gas & Elec. Co.,* 306 U.S. 307, 59 S.Ct. 543, 83 L.Ed. 669 (1939) and *Pepper v. Litton,* 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939)—it has been limited to cases involving (1) fraud, illegality or breach of fiduciary duty, (2) undercapitalization, and (3) control or use of the debtor as an alter ego for the benefit of the claimant. *In re Fabricators, Inc.,* 926 F.2d 1458, 1467 (5th Cir.1991); *Webster v. Barbara (In re Otis & Edwards, P.C.),* 115 B.R. 900, 914 (Bankr.E.D.Mich.1990); *McChesney v. Owoc (In re Shelter Enterprises, Inc.),* 98 B.R. 224, 230 (Bankr.W.D.Pa.1989); *Sleepy Valley, Inc. v. Leisure Valley, Inc. (In re Sleepy Valley, Inc.),* 93 B.R. 925, 933 (Bankr. W.D.Tex.1988); *see In re 604 Columbus Ave. Realty Trust,* 968 F.2d 1332, 1359–60 (1st Cir.1992) (equitable subordination usually applies to three situations: the fiduciary's misuse of his position to the disadvantage of creditors, third party domination and control plus disadvantage, and fraud); *In re CTS Truss, Inc.,* 868 F.2d 146, 148–49 (5th Cir.

1989) (same); *see generally* 3 Collier ¶ 510.-05[4], at 510–16–19; 2 Epstein § 6–93, at 257.

The doctrine is also applicable to general creditors, but identifying the degree of conduct that will justify its invocation has proven even more "slippery" and unpredictable. The average general creditor does not owe a fiduciary duty to the debtor or the creditors of the debtor in the collection of its claim:

> We entirely agree with [the bankruptcy judge's] conclusion that '[a] creditor·is under no fiduciary obligation to its debtor or to other creditors of the debtor in the collection of its claim', 4 B.R. at 75, and cases cited therein. *See Weinberger v. Kendrick,* 698 F.2d 61 at 78 (2d Cir.1982). The permissible parameters of a creditor's efforts to seek collection from a debtor are generally those with respect to voidable preferences and fraudulent conveyances proscribed by the Bankruptcy Act; apart from these there is generally no objection to a creditor's using his bargaining position, including his ability to refuse to make future loans needed by the debtor, to improve the status of his existing claims.

*In re W.T. Grant Co.,* 699 F.2d 599, 609–10 (2d Cir.), *cert. denied,* 464 U.S. 822, 104 S.Ct. 89, 78 L.Ed.2d 97 (1983); *accord Anaconda–Ericsson, Inc. v. Hessen (In re Teletronics Services, Inc.),* 29 B.R. 139, 170 (Bankr. E.D.N.Y.1983); 2 Epstein § 6–93, at 269–70; DeNatale & Abram at 430. As a consequence, "[c]ases subordinating the claims of creditors that dealt at arm's length with the debtor are few and far between." *Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting,* 908 F.2d 1351, 1356 (7th Cir.1990).

In the struggle to identify the precise type of conduct that will support the equitable subordination of a non-insider's claim, courts have groped for an appropriate definition of a heightened standard of wrongdoing. The majority require conduct that is "gross and egregious." *See e.g., Waslow v. MNC Commercial Corp. (In re M. Paolella & Sons, Inc.),* 161 B.R. 107, 119 (E.D.Pa.1993); *Bank of New Richmond v. Production Credit Ass'n (In re Osborne),* 42 B.R. 988, 997 (W.D.Wis.1984.) This includes "substantial misconduct tantamount to fraud, misrepresentation, overreaching or spoilation," *Tele-*

*tronics Services, Inc.,* 29 B.R. at 173; *accord Rosania v. Haligas (In re Dry Wall Supply, Inc.),* 111 B.R. 933, 938 (D.Colo.1990); *Burner v. Security State Bank (In re Burner),* 109 B.R. 216, 228 (Bankr.W.D.Tex.1989); *In re W.T. Grant Co.,* 4 B.R. 53, 75 (Bankr. S.D.N.Y.1980), *aff'd,* 20 B.R. 186 (S.D.N.Y. 1982), *aff'd,* 699 F.2d 599 (2d Cir.), *cert. denied,* 464 U.S. 822, 104 S.Ct. 89, 78 L.Ed.2d 97 (1983), or conduct involving moral turpitude. *See Miller v. Borton (In re Bowman Hardware & Elec. Co.),* 67 F.2d 792, 794 (7th Cir.1933); *Waslow v. MNC Commercial Corp. (In re M. Paolella & Sons, Inc.),* 161 B.R. 107, 119 (E.D.Pa.1993); *Mayo,* 112 B.R. at 650.

In practice, these definitions provide little guidance; they describe a standard that is rarely if ever met. The cases that enunciate the "gross and egregious" or similar standard uniformly fail to find conduct that meets the standard, and deny equitable subordination. *See e.g., Boyajian v. DeFusco (In re Giorio),* 862 F.2d 933, 939 (1st Cir. 1988) (Breyer, J.); *Unsecured Creditors' Committees v. Pioneer Commercial Funding Corp. (In re Pacific Express, Inc.),* 69 B.R. 112, 118 (Bankr.9th Cir.1986); *Paolella & Sons,* 161 B.R. at 120–21; *Dry Wall Supply,* 111 B.R. at 938–39; *Committee of Unsecured Creditors v. Hoopes (In re Pittsburgh Cut Flower Co.),* 124 B.R. 451, 462 (Bankr. W.D.Pa.1991); *Mayo,* 112 B.R. at 651–52; *Burner,* 109 B.R. at 228; *Badger Freightways, Inc. v. Continental Illinois Nat'l Bank & Trust Co. (In re Badger Freightways, Inc.),* 106 B.R. 971, 979 (Bankr.N.D.Ill.1989); *Sleepy Valley, Inc.,* 93 B.R. at 933; *Security Federal Savings & Loan Ass'n v. Commercial Investments, Ltd. (In re Commercial Investments, Ltd.),* 92 B.R. 488, 492 (Bankr. D.N.M.1988); *Pinetree Partners, Ltd. v. OTR (In re Pinetree Partners, Ltd.),* 87 B.R. 481, 489–90 (Bankr.N.D.Ohio 1988); *Jordan & Nobles Construction Co. v. Orah Wall Financial Corp. (In re Orah Wall Financial Corp.),* 84 B.R. 442, 444 (Bankr.W.D.Tex.

1986); *Teletronics Services,* 29 B.R. at 173; *In re Minnesota Kicks, Inc.,* 48 B.R. 93, 106–07 (Bankr.D.Minn.1985); *W.T. Grant Co.,* 4 B.R. at 79.

There are very few exceptions. And those cases that heighten the standard and find that a non-insider/non-fiduciary acted inequitably, base their decisions on conduct which violates a generally recognized duty that exists outside of bankruptcy law. *See, e.g., Bowman Hardware & Elec. Co.,* 67 F.2d at 794 (claimant who participated in scheme to misrepresent to another creditor the existence of the claimant's loan to the debtor was equitably subordinated to that creditor's claim); *604 Columbus Ave. Realty Trust v. Capitol Bank & Tr. Co. (In re 604 Columbus Ave. Realty Trust),* 119 B.R. 350, 377 (Bankr. D.Mass.1990) (bank's claim would be equitably subordinated where bank was guilty of misappropriation of loan proceeds, fraud and breach of contract and its conduct caused injury to creditors and gave it an unfair advantage), *aff'd in part and vacated in part on other grounds,* 968 F.2d 1332 (1st Cir. 1992); *Osborne,* 42 B.R. at 999–1000 (claimant's misrepresentation to another creditor, coupled with that creditor's justifiable reliance, supported equitable subordination of claimant's claim but only to claim of injured creditor); *see Giorgio,* 862 F.2d at 939.

■ It appears, therefore, that there is no different or heightened standard to judge a non-insider/non-fiduciary's conduct; there are just fewer traditional grounds available.[5] Neither undercapitalization nor breach of fiduciary duty applies. Thus, unless the claimant controls the debtor, and exercises that control to gain an unfair advantage, the proponent of equitable subordination must show wrongful conduct involving fraud, illegality or some other breach of a legally recognized duty. DeNatale & Abram at 430 ("[non-insider] creditor must be found to have engaged in some specific conduct that gave rise to a fiduciary, contractual, or legally recognized duty to the other creditors before its

---

5. The distinction between insider and non-insider creditors is still important for allocating the burden of proof. In the case of an insider, once the proponent provides a substantial basis to support the charge of unfairness, the burden shifts to the insider to show the fairness of his

claim. 3 Collier ¶ 510.05[3][b], at 510–15; *see Pepper v. Litton,* 308 U.S. at 306, 60 S.Ct. at 245. In the case of non-insider claims, the proponent always bears the burden of proof. 2 Epstein § 6–93, at 263.

claim will be equitably subordinated.") (footnote omitted); 2 Epstein § 6–93, at 265–70 (absent actual control of the debtor, subordination of a non-insider's claim requires unlawful conduct such as fraud or other tort, breach of contract or estoppel); 4 James F. Queenan at al., *Chapter 11 Theory and Practice: A Guide to Reorganization* § 23.18, at 23:55 (1994) (in subordinating non-insider claims, a court should not apply standards of conduct different from those that govern traditional causes of action).

█ Hence, the standard of inequitable conduct that justifies subordination of a non-insider/non-fiduciary's claim can be summarized in the following manner: unless the creditor has dominated or controlled the debtor to gain an unfair advantage, his claim will be subordinated, based upon inequitable conduct, only if the claimant has committed some breach of an existing, legally recognized duty arising under contract, tort or other area of law. In commercial cases, the proponent must demonstrate a substantial breach of contract and advantage-taking by the creditor. *604 Columbus Ave. Realty Trust,* 968 F.2d at 1362 (quoting *Kham & Nate's Shoes No. 2,* 908 F.2d at 1357). In the absence of a contractual breach, the proponent must demonstrate fraud, misrepresentation, estoppel or similar conduct that justifies the intervention of equity. *See, e.g., Trinity Nat'l Bank v. Bobby Boggs, Inc. (In re Bobby Boggs, Inc.),* 819 F.2d 574, 579 (5th Cir.1987) ("[T]he principles of promissory estoppel also support finding equitable subordination under 11 U.S.C. § 510(c)(1).");[6] *604 Columbus Ave. Realty Trust,* 119 B.R. at 377 ("[F]raud and illegality constitute grounds for equitable subordination even where the creditor is not a fiduciary or insider or does not somehow control the debtor."); *First Nat'l Bank v. Charles Blalock & Sons, Inc. (In re Just For the Fun of It of Tennessee, Inc.),* 7 B.R. 166, 181 (Bankr.E.D.Tenn.1980) ("Before a creditor's claim may be disallowed or its status lowered, it must appear that the creditor has been guilty of some breach of

duty or misrepresentation whereby other creditors were deceived to their damage.").

### 3. Injury to the Debtor or its Creditors

█ The second prong of the *Mobile Steel* test requires the proponent of equitable subordination to plead and prove that the offending conduct caused injury to the debtor or its creditors, or resulted in an unfair advantage to the claimant. *Mobile Steel,* 563 F.2d at 700–01. If the misconduct results in harm to the entire creditor body, the objecting party need not identify the injured creditors or quantify their injury, but need only show that the creditors were harmed in some general, concrete manner. DeNatale & Abram at 426. Thus, it is sufficient to allege that the general creditors are less likely to collect their debts. *Id.* In that event, the claim will be subordinated to the payment of all other claims.

█ The principle of equitable subordination, however, empowers and requires the Bankruptcy Court to tailor the remedy to fit the harm. If the injury or unfair advantage affects only a specific creditor or segment of creditors, the court should subordinate the offending claimant only to the more limited class of claims rather than the claims of all creditors. *Bowman Hardware & Elec. Co.,* 67 F.2d at 795; *Osborne,* 42 B.R. at 1000; DeNatale & Abram at 426. In this regard, equitable subordination is remedial, not penal, and a claim will be subordinated only to the extent necessary to offset the harm that resulted. *Trone v. Smith (In re Westgate–California Corp.),* 642 F.2d 1174, 1178 (9th Cir.1981); *Mobile Steel,* 563 F.2d at 701; *Kansas Journal–Post,* 144 F.2d at 802–03; *Unsecured Creditors' Committee v. Banque Paribas (In re Heartland Chemicals, Inc.),* 136 B.R. 503, 520 (Bankr.C.D.Ill.1992); DeNatale & Abram at 423. The scope of the remedy is, therefore, limited by the extent of the injury, and not by the shocking nature of the claimant's conduct.

*Bobby Boggs,* 819 F.2d at 579 n. 7.

---

**6.** Promissory estoppel, discussed *infra,* may also support subordination under 11 U.S.C. § 510(a).

### 4. Consistency with the Bankruptcy Law

■ The third prong of the *Mobile Steel* test acknowledges that the principles of equitable subordination cannot be used to alter the statutory scheme, such as by adjusting an innocent party's legally valid claim to achieve a result that the court believes to be equitable. *Mayo,* 112 B.R. at 651; DeNatale & Abram at 428.

The requirement that subordination must be consistent with bankruptcy law comes into play only after the court has concluded that the first two prongs have been satisfied. Conversely, if a court determines that the party advocating equitable subordination has satisfied the first two prongs of the *Mobile Steel* test, it is difficult to imagine a situation in which equitable subordination would not be warranted by bankruptcy law. And since the Bankruptcy Code, unlike its predecessors, expressly authorizes the remedy of equitable subordination, the third prong of the *Mobile Steel* test is likely to be moot. *In re Hyperion Enterprises, Inc.,* 158 B.R. 555, 560 n. 1 (D.R.I.1993); *Diasonics v. Ingalls,* 121 B.R. 626, 628 (Bankr.N.D.Fla.1990).

### B. The Debtor's Complaint

#### 1. Introduction

■ On a motion to dismiss, the factual allegations in the complaint are presumed true, and all reasonable inferences are drawn in the plaintiff's favor. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957); *Raine v. Lorimar Productions, Inc.,* 71 B.R. 450, 453 (S.D.N.Y.1987). Dismissal is proper only when the plaintiff would not be entitled to any type of relief, even if it prevailed on the merits of its factual allegations. *Cohen v. Koenig,* 25 F.3d 1168, 1171–72 (2d Cir.1994); *Sykes v. James,* 13 F.3d 515, 519 (2d Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 2749, 129 L.Ed.2d 867 (1994); *Dopico v. Goldschmidt,* 687 F.2d 644, 649 (2d Cir.1982); *Wedtech Corp. v. Nofziger (In re Wedtech Corp.),* 88 B.R. 619, 622 (Bankr. S.D.N.Y.1988).

#### 2. The Allegations Regarding the Debtors and Their Principals

In considering the sufficiency of the Debtors' Complaint, the Court begins with a review of what it does *not* allege. According to the Complaint, the Debtors and Crossland stood in a debtor-creditor relationship. Crossland was not an insider, no fiduciary duty existed between the parties, and the Complaint neither states nor implies that Crossland exercised dominion or control over the Debtors' affairs. Further, this is not a case in which the claimant could be charged with undercapitalizing the debtor, and that ground is also not available.

■ In order to demonstrate the requisite inequitable conduct, the Debtors must, therefore, allege facts showing fraud, illegality [7] or breach of some other legal duty owing by Crossland to the Debtors or their creditors. The complaint does not, however, allege fraud. A fraud claim requires the plaintiff to plead and prove (1) a misrepresentation, (2) of a material fact, (3) that was false, (4) that the defendant knew was false, (5) that was made for the purpose of inducing the plaintiff to rely on it, (6) that the plaintiff justifiably relied on the misrepresentation, (7) in ignorance of the falsity, and (8) as a result, suffered injury. *Cohen v. Koenig,* 25 F.3d at 1171–72; *Murray v. Xerox Corp.,* 811 F.2d 118, 121 (2d Cir.1987).

■ The Complaint does not allege that when Crossland promised to enter into "meaningful negotiations" if the real estate taxes and other expenses were paid, these statements were false or that Crossland knew that they were false. In this regard, the failure to fulfill a promise to perform a future act is not fraudulent unless the defendant did not intend to perform at the time it made the promise. *Cohen v. Koenig,* 25 F.3d at 1171–72; *Murray v. Xerox Corp.,* 811 F.2d at 121. Absent allegations of falsity and scienter, no fraud claim exists.

In addition, the Complaint does not allege that Crossland breached a contractual duty

---

7. The Complaint does not allege any facts suggesting that Crossland acted illegally, and the Court will not consider this ground any further.

to the Debtors or their creditors. Crossland did not cause the Debtors' cash flow problems, and was under no obligation to extend a mortgage that had become due, or renegotiate its terms, or continue to finance the Debtors' operations or ownership of the mortgaged real estate. In short, it had the absolute and immediate right to foreclose its mortgage.

 The Complaint does, however, arguably allege equitable or promissory estoppel. The elements of equitable estoppel are (1) a material misrepresentation, (2) reliance and (3) damage. *Lee v. Burkhart,* 991 F.2d 1004, 1009 (2d Cir.1993). It is immaterial that there is no actual attempt to defraud or mislead. *Columbia Broadcasting System v. Stokely–Van Camp, Inc.,* 522 F.2d 369, 378 (2d Cir.1975) (interpreting New York law). Rather, the party against whom estoppel is asserted had to intend, or at least expect, that another would act based upon its representation. *Southern Federal Savings & Loan Association v. 21–26 East 105th Street Associates,* 145 B.R. 375, 381 (S.D.N.Y.1991), *aff'd,* 978 F.2d 706 (2d Cir.1992) (Table Mem.).

 Promissory estoppel, on the other hand, requires proof of (1) a clear and unambiguous promise, (2) reasonable and foreseeable reliance by the person to whom the promise is made and (3) injury as a result of the reliance. *Arcadian Phosphates, Inc. v. Arcadian Corp.,* 884 F.2d 69, 73 (2d Cir. 1989); *R.G. Group v. Horn & Hardart Co.,* 751 F.2d 69, 78 (2d Cir.1984); *Reprosystem, B.V. v. SCM Corp.,* 727 F.2d 257, 264 (2d Cir.), *cert. denied,* 469 U.S. 828, 105 S.Ct. 110, 83 L.Ed.2d 54 (1984); *Van Brunt v. Rauschenberg,* 799 F.Supp. 1467, 1473 (S.D.N.Y.1992). Both forms of estoppel spring from the same equitable origins, *see,* John D. Calamari & Joseph M. Perillo, *The Law of Contracts* § 6–2(e), at 281 (3d ed. 1987) ("[E]quitable estoppel is an historical antecedent of promissory estoppel."), and the principal distinction is that equitable estoppel involves a misrepresentation of an existing fact while promissory estoppel concerns a statement of intention regarding future con-

duct. *Triology Variety Stores, Ltd. v. City Products Corp.,* 523 F.Supp. 691, 697 n. 3 (S.D.N.Y.1981); Jay M. Feinman, *Promissory Estoppel and Judicial Method,* 97 Harv. L.Rev. 678, 718 (1984); Janine McPeters Murphy, *Promissory Estoppel: Subcontractors' Liability in Construction Bidding Cases,* 63 N.C.L.Rev. 387, 403 (1985).

The Complaint alleges, in several paragraphs, that Crossland represented that it "would meet" with the Debtors, for "meaningful" discussions regarding the renegotiation of the mortgage, if the real estate taxes and certain other expenses were paid. This sounds like a statement of intention to perform a future act—rather than a misrepresentation of an existing fact—and might form the basis of a claim based on promissory estoppel.

 Whether the estoppel is promissory or equitable, the proponent must also plead and prove reliance and a resulting injury. A party cannot assert estoppel, however, as a result of being "induced" to do what he is already legally required to do. *Cf. Bank Leumi Tr. Co. v. D'Evori Int'l, Inc.,* 163 A.D.2d 26, 33, 558 N.Y.S.2d 909, 916 (1st Dept.1990) (a party cannot be defrauded into doing what he is already legally obligated to do). On this basis, the estoppel claims of the Debtors and their principals must fall.

Neither the Debtors nor their principals can claim that they relied on Crossland's "promise" to meet, as the inducement to paying the real estate taxes and other expenses. Even without a contractual obligation imposed under an agreement with its mortgagee,[8] a property owner in New York is personally liable for real estate tax assessments made against the property that he owns. If he fails to pay the taxes after proper demand, the collecting officer can levy on his *personal* property and sell it. N.Y.Real Prop.Tax § 926 (McKinney 1989). The Debtors were also required to pay their other expenses. If the Debtors were independently obligated to pay all of these expenses, nothing that Crossland said or did could, as a matter of law, have induced them to do so.

---

**8.** The Complaint does not annex any of the agreements that define the parties' rights.

The same holds true for the Debtors' principals. All of the Debtors in these cases are New York general partnerships, (Complaint ¶ 1), and under New York law, general partners are liable for the debts of their partnerships. N.Y. Partnership § 26 (McKinney 1988). Hence, where the partnership is unable to pay a general partnership tax obligation or expense, and the general partner does so, the general partner is merely fulfilling an obligation imposed upon him by law. Consequently, neither the Debtors nor their principals can invoke estoppel against Crossland. As there is no other basis upon which to conclude that Crossland is guilty of inequitable conduct against the Debtors or their principals, the Court concludes that Debtors have failed to satisfy the first prong of the *Mobile Steel* test.

The Complaint is also legally insufficient under the second prong of the *Mobile Steel* test. The Complaint seeks to subordinate Crossland's *entire* claim without setting forth the degree of the injury it caused or the unfair advantage that Crossland obtained. The Complaint does not charge that the initial obligation of $16 million is tainted with any inequitable conduct, and does not allege facts, which if proven, would justify this Draconian result of complete subordination.

█ Further, the Complaint fails to allege a legally sufficient injury to the creditor body as a whole. The Complaint states that as a result of Crossland's refusal to participate in a meaningful meeting, the Debtors were forced to file Chapter 11. (Complaint ¶ 26). The filing of a bankruptcy petition, without more, is a legally insufficient allegation of injury to satisfy the requirements of equitable subordination. *See Kham & Nate's Shoes No. 2,* 908 F.2d at 1358 (proof that Bank's refusal to give credit, forcing debtor into bankruptcy, does not show an injury because bankruptcy often helps rather than injures). The plaintiff must, at a minimum, allege that as a result of the filing, the gener-

al creditors are likely to receive a smaller distribution on their claims.[9]

### 3. The Allegations Regarding Sutton Investments

█ The allegations regarding Sutton Investments may stand on a different footing. At one point in their Complaint, the Debtors allege that Crossland breached its duty of good faith by assuring the Debtors and their partners that if Sutton Investment paid the real estate taxes, Crossland would enter into "meaningful negotiations." (Complaint ¶ 35.)

The Court has serious doubts that the promise to meet to engage in "meaningful negotiations" is the type of clear and unambiguous promise that will support a claim of promissory estoppel and equitable subordination. "Meaningful negotiations" is ambiguous to the point of being meaningless, and Crossland never promised that it would actually renegotiate the terms of the Agreement, or extend the due date of its past due mortgage. Nevertheless, the pleading can be read to allege that Crossland made a clear and unambiguous promise to negotiate in good faith, which, when coupled with the allegations in the Complaint regarding Sutton Investment's reliance and injury, supports a claim of promissory estoppel. *See Arcadian Phosphates, Inc. v. Arcadian Corp.,* 884 F.2d at 74.

The allegations of injury do not, however, support the degree of equitable subordination that the Complaint demands. To the extent Sutton relied on Crossland's representations in paying the real estate taxes and other expenses, it suffered an injury, and moreover, Crossland obtained an advantage. The payment prevented the assessment, at a later date, of a superior tax lien, and consequently, enhanced the value of the realty securing Crossland's mortgage.

The Complaint does not, however, indicate how much Sutton Investment paid in reliance on Crossland's misrepresentations, and in-

9. This requirement appears even more compelling in single asset real estate cases like the ones involved in this adversary proceeding. Frequently, the debtor in a single asset real estate case lacks equity in the property, cannot service the secured debt, and files a bankruptcy petition to

prevent or delay a foreclosure sale. The secured creditor's liquidation of valid lien rights against property in which the general creditors have no equity does not injure the creditor body. *Kansas City Journal–Post,* 144 F.2d at 802.

stead, seeks to subordinate Crossland's entire claim which its Complaint will not permit it to do. To afford the Debtors an opportunity to allege a legally sufficient claim, the Court, in granting the motion to dismiss, will also grant the Debtors leave to replead within thirty days to assert a claim for equitable subordination but only to the extent that Crossland induced Sutton Investment to advance funds to pay the Debtors' obligations.

IT IS SO ORDERED.