IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

June 20, 2008

Charles R. Fulbruge III
Clerk

No. 07-50872

In the Matter of: SI RESTRUCTURING, INC; SRI RESTRUCTURING, INC; SRE RESTRUCTURING, INC.; SF RESTRUCTURING, INC.; SFOPS RESTRUCTURING, LLC; SBPROD RESTRUCTURING, LLC; DFW RESTAURANT TRANSFER CORP.; 56TH AND 6TH, INC.; SAN FELIPE, LLC,

Debtors,

JOHN C. WOOLEY; JEFFREY J. WOOLEY,

Appellants,

v.

DENNIS FAULKNER, PLAN ADMINISTRATOR OF SI RESTRUCTURING, INC.,

Appellee.

Appeal from the United States District Court
for the Western District of Texas, San Antonio Division
USDC No. 5:07-cv-0272

Before DAVIS and SOUTHWICK, Circuit Judges, and CLARK, District Judge.[*]
W. EUGENE DAVIS, Circuit Judge.

This is an appeal from a district court order affirming a bankruptcy court's order invoking equitable subordination pursuant to 11 U.S.C. § 510(c), which

---

[*] District Judge of the Eastern District of Texas, sitting by designation.

effectively converted secured claims filed by the Appellants, John and Jeffrey Wooley, to unsecured claims for the purpose of any distributions. Because we conclude that the Trustee did not demonstrate that Appellants' loans to the debtor harmed either the debtor or the general creditors, subordination of Appellants' claims was inappropriate, and we reverse the subordination order and render judgment in favor of appellants.

I.

This dispute arises from the loans made by John and Jeffrey Wooley ("the Wooleys") to Schlotzsky's, Inc. ("Schlotzsky's"). At the time of the events giving rise to this appeal, the Wooleys were officers and directors and the largest shareholders of Schlotzsky's. In order to relieve a critical cash crunch faced by Schlotzsky's, the Wooleys made two loans to the corporation: one in April 2003 for $1 million and another in November 2003 for $2.5 million.

The Wooleys made the April loan after other financing options fell through. This loan was secured with the company's royalty streams from franchisees, the company's intellectual property rights, and other intangible property. Schlotzsky's and the Wooleys were represented by separate legal counsel for the April loan negotiations. The loan terms were approved by the audit committee and Schlotzsky's board of directors as a related-party transaction, and the transaction was disclosed in the company's filings with the SEC.

Throughout 2003, the company continued to experience severe cash flow problems, and the Wooleys continued their efforts to obtain financing. The board of directors was keenly aware of these efforts. In the fall of 2003, Schlotzsky's general counsel approached the International Bank of Commerce ("IBC") about a loan to the company. IBC declined to make the loan to the company but agreed to allow the Wooleys to borrow the funds directly from the bank so that the Wooleys could, in turn, lend the proceeds to Schlotzsky's. The need for this

additional financing and the possibility of this loan by the Wooleys was discussed at an October 31, 2003 board meeting. The loan to the company was approved by the board and made on November 13, 2003.

In finding the Wooleys' conduct to be inequitable, the bankruptcy court focused on this second loan ("the November loan") and attached significance to the short notice given to the board for approval. IBC formally approved the loan to the Wooleys on November 10, 2003. The following day, the board was provided notice of a special meeting scheduled for November 13, 2003 to approve the Wooleys' loan to the company. Before the special meeting, the board members were provided with copies of the proposed promissory note and the security agreement along with e-mails from the company's assistant general counsel. As with the April loan, the November loan was secured with the company's rights to the royalty streams from franchisees, intellectual property rights, and, and general intangibles.

When the loan was made, the Wooleys had in place personal guarantees which guaranteed pre-existing Schlotzsky's debt in the amount of $4.3 million. As part of the November loan package, the Wooleys also secured this potential liability under the guarantees with the same collateral that secured the April and November loans.

At the November 13, 2003 board meeting, conducted via telephone conference call, the board was told that without the infusion of additional funds, payroll could not be met and that the company would default on a payment to a secured creditor. All of the non-interested directors in attendance approved the loan without objection. An independent audit committee also approved the loan, and the transaction was publicly disclosed in SEC filings.

In mid-2004, the Wooleys were removed as officers of the corporation and resigned their positions as directors. The financial condition of the company deteriorated further, and a Chapter 11 Bankruptcy proceeding was filed in

August 2004. The Wooleys filed secured claims relating to the April and November loans. The committee of unsecured creditors brought an adversary proceeding against the Wooleys, challenging their right to be treated as secured creditors with respect to these claims.

The bankruptcy court found that John and Jeffrey Wooley, as fiduciaries, engaged in inequitable conduct in relation to the November transaction and that their conduct conferred an unfair advantage upon them. This inequitable conduct stemmed from a breach of fiduciary duties that the Wooleys owed to Schlotzsky's as officers and directors. According to the bankruptcy court, the Wooleys breached their fiduciary duties in part by the manner in which they presented the November loan transaction to the board. The court found that the transaction was presented as the only option available, at the eleventh hour, as a fait accompli. In other words, the board was given the option, "approve the loan or the company collapses tomorrow." Additionally, the judge questioned why the Wooleys required that the loan be secured if it was truly meant to be a temporary loan to secure permanent financing. By securing the loan with the income stream of the franchise company, the crown jewel of the Schlotzsky's complex, the bankruptcy court concluded that the Wooleys "grabbed for as much as they could get[,] and they got it all." The final straw to the bankruptcy court was the Wooleys' insistence on securing their pre-existing contingent liability on their personal guarantees with the revenue stream of the franchise company. The bankruptcy court found that securing the Wooleys' contingent liability effectively released them as guarantors on the debt at the expense of the corporation and its unsecured creditors. In the words of the bankruptcy court: "[t]hat's unfair advantage." The bankruptcy court, however, made no specific findings that the Wooleys' actions in securing either of the 2003 loans or their pre-existing contingent liability on the guarantees resulted in harm to the corporation or to the unsecured creditors.

The bankruptcy court ordered that the Wooleys' claims based on both the April and November loans be equitably subordinated and thus converted from secured to unsecured status. The district court agreed with the bankruptcy court and affirmed. The Wooleys then lodged this appeal.

II.

We review the bankruptcy court's findings of fact for clear error, and the conclusions of law of the bankruptcy and district courts are reviewed de novo.[1]

III.

A.

Appellants argue that the bankruptcy court's application of the "extraordinary remedy"[2] of equitable subordination is not warranted in this case. The Wooleys assert that none of the bankruptcy court's findings of inequitable conduct relate to the April transaction and that the court's findings do not support subordination of their claim based on this loan. They also argue that they did not act inequitably in structuring the loan to the corporation as they did and that the record does not support the finding that they breached their fiduciary obligations. They contend that their November loan to Schlotzsky's was an arms-length transaction with approval of the board, including disinterested directors and independent audit committee members. They point out that the company had its own in-house counsel and outside securities counsel who reviewed the transaction. The Wooleys assert that all members of

---

[1] Robertson v. Dennis (In re Dennis), 330 F.3d 696, 701 (5th Cir. 2003) (quoting Gamble v. Gamble (In re Gamble), 143 F.3d 223, 225 (5th Cir. 1998)); Summitt Coffee Co. v. Herby's Foods, Inc. (In the Matter of Herby's Foods, Inc.), 2 F.3d 128, 130–31 (5th Cir. 1993).

[2] See MBank New Braunfels, N.A. v. F.D.I.C., 772 F.Supp. 313, 325 (N.D. Tex. 1991); Holt v. F.D.I.C. (In the Matter of CTS Truss, Inc.), 868 F.2d 146, 148-49 (5th Cir. 1989) (equitable subordination is an unusual remedy which should be applied only in limited circumstances); A. DeNatale and P. Abram, The Doctrine of Equitable Subordination as Applied to Nonmanagement Creditors, 40 Business Lawyer, 417, 429 (1985) ("Indeed, only in a handful of cases have the courts seen fit to apply the doctrine [of equitable subordination].").

the board of directors and audit committee knew of the precarious financial condition of the company, that they were not surprised about the urgent need for the loan, and that the bankruptcy court improperly faulted them for obtaining the board's quick approval of the transaction. They argue that the bankruptcy court improperly found that the transaction occurred at the "eleventh hour" or that the timing of the loan justified equitable subordination of the Wooleys' claims.

The Wooleys also assert that they did nothing improper in negotiating an agreement with the company to obtain security as a condition of making the loan. The Wooleys contend that no evidence was presented that the November transaction resulted in an unfair advantage to them. They contend that the bankruptcy court's conclusion amounts to a per se rule that an insider creditor cannot obtain security for a loan or for preexisting contingent liability from a solvent company. The Wooleys emphasize that the bankruptcy court found that the November loan was real money that was used by the company to pay off its debts, and it, therefore, benefitted the company's creditors. We now turn to a consideration of the law that applies to the issues these arguments raise.

B.

The authority to equitably subordinate bankruptcy claims derives from 11 U.S.C. § 510(c), which provides:

> (c) Notwithstanding subsections (a) and (b) of this section, after notice and a hearing, the court may —

> (1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or

(2) order that any lien securing such a subordinated claim be transferred to the estate.[3]

The Bankruptcy Code does not otherwise set forth the circumstances under which equitable subordination is appropriate; however, the case law has formulated a number of requirements to guide courts in their application of this remedy. This Court in In re Mobile Steel Corp. articulated the widely quoted three-prong test for equitable subordination: (1) the claimant must have engaged in inequitable conduct; (2) the misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant; and (3) equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Code.[4] In re Mobile Steel Corp. adds an additional requirement, critical to the decision in this case: a claim should be subordinated only to the extent necessary to offset the harm which the debtor or its creditors have suffered as a result of the inequitable conduct.[5]

In In re Mobile Steel Corp.,[6] the plaintiffs were insiders of the debtor steel corporation. Before the corporation filed for bankruptcy, it purchased commercial property for tax purposes and then sold the property. The commercial property was purchased from the insider plaintiffs in exchange for promissory notes; no cash changed hands. In a separate transaction, the plaintiffs loaned the corporation $250,000 in exchange for unsecured debentures

---

[3] 11 U.S.C. § 510(c).

[4] Benjamin v. Diamond (In re Mobile Steel Corp.), 563 F.2d 692, 700 (5th Cir. 1977) (internal citations omitted); Official Comm. of Unsecured Creditors v. Cajun Elec. Power Coop., Inc. (In the Matter of Cajun Elec. Power Coop., Inc.), 119 F.3d 349, 357 (5th Cir. 1997).

[5] In re Mobile Steel Corp., 563 F.2d at 701; see also 80 Nassau Assoc. v. Crossland Federal Savings Bank (In re 80 Nassau Assoc.), 169 B.R. 832, 840 (Bankr. S.D.N.Y. 1994) (the scope of the remedy of equitable subordination is limited by the extent of injury).

[6] 563 F.2d 692.

in that amount, bearing 6% interest.  The Trustee sought to have the plaintiffs' claims equitably subordinated, contending that the insider's sale of the commercial property to the debtor constituted over-reaching, mismanagement, and abuse of a fiduciary position and that the debentures should be treated as capital contributions and not entitled to debt treatment.  The district court affirmed the bankruptcy court's order subordinating the plaintiffs' claims, finding that the plaintiffs failed to demonstrate that they had performed their fiduciary duties and acted in good faith in dealing with the corporation.  We reversed, finding:

> [E]ven if it is assumed that the [A]ppellants acted unfairly in all of the ways suggested by the bankruptcy judge, equitable subordination of their claims to those advanced by the other unsecured creditors still could not be justified because the Trustee has made no factual showing that any of these purported improprieties injured either Mobile Steel or its creditors.[7]

Thus, In re Mobile Steel teaches that equitable subordination is remedial, not penal, and in the absence of actual harm, equitable subordination is inappropriate.[8]  We have found no contrary authority, and none has been cited to us.

Collier on Bankruptcy states the rule as follows: "the offending party's claim will be subordinated only to those who can show actual injury."[9]  Further, a determination of equitable subordination must be supported by "specific findings and conclusions with respect to each requirement."[10]

---

[7] Id. at 706.

[8] See also Estes v. N & D Props., Inc. (In re N & D Props. Inc.), 799 F.2d 726, 733 (11th Cir. 1986) (equitable subordination operates only to redress the amount of actual harm done).

[9] 4 COLLIER ON BANKRUPTCY ¶ 510.05[3][e], 510–31 (15th ed. Revised).

[10] Fabricators, Inc. v. Technical Fabricators, Inc. (In re Fabricators), 926 F.2d 1458, 1465 (5th Cir. 1991); see also Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims, 323 F.3d 228, 231–32 (3d Cir. 2003).

C.

The bankruptcy court made no findings of inequitable conduct by the Wooleys with respect to the April loan. As to the November transactions, we assume, without deciding, that the record supports the finding of inequitable conduct and unfair advantage. However, the bankruptcy court made no finding of harm,[11] and the record does not support a finding that either the debtor or the unsecured creditors were harmed by the November transaction.

Appellee argues that when the company secured the Wooleys' loan with the assets of Schlotzsky's Franchisor, L.L.C., this reduced the assets available to the unsecured creditors and injured them. This argument fails because neither the record nor the bankruptcy court's findings support a view that general unsecured creditors as a class were harmed. Indeed, the bankruptcy court found that the proceeds of the loan were used to pay the unsecured creditors and keep the company in operation:

> I am not finding that the debtor didn't need the money. I'm not finding that the debtor didn't use the money. I'm not finding that the debtor didn't actually use the money to pay down debt. Of course, it did. Of course, it did.

Because the loan proceeds were used to pay current unsecured creditors, unsecured creditors, as a class, were not harmed when the Wooleys' obtained security for the November loan. The general unsecured creditors who were paid from the proceeds of the November loan may have benefitted to the detriment of another group of unsecured creditors, but this does not mean that unsecured creditors were harmed when the Wooleys obtained security for their loan. Further, the unsecured creditors who remain unpaid have advanced no theory supporting a view that they were entitled to payment over the creditors who were paid from the proceeds of the April and November loans.

---

[11] Although, the district court attributed a finding of harm to the bankruptcy court, no such finding was made by the bankruptcy court.

A similar argument was rejected by the Ninth Circuit in In re Universal Farming Industries, in which the holder of a secondary trust deed on property owned by a debtor in bankruptcy brought suit against the holder of the first trust deed on the same piece of property, claiming that the first trust deed should be equitably subordinated.[12] The plaintiff argued that he and other creditors were harmed because they risked not being paid in full due to the priority enjoyed by the first trust deed holder.[13] The court rejected this argument, concluding that "such a risk arose from the latter creditor's status as a junior lienholder; the trust deed holder's misconduct, if any, did not create that risk."[14]

Appellee further argues that by taking securing their existing personal guarantees, the Wooleys were effectively released from liability for the guarantees, thus securing an unfair advantage. This argument could have merit if the company had defaulted on the underlying debt and the Wooleys' potential liability under the guarantees had been triggered. The record reveals, however, that the Wooleys' potential obligation on the guaranty agreements was never triggered because the company never defaulted on its principal obligation covered by the guarantees. Because no claim ever arose on these guarantees, no harm resulted.

Appellee also asserts that the unsecured creditors were harmed because the value of the company deteriorated as a result of the November loan transaction, thus decreasing the amount of funds available for the creditors. Although Appellee denies seeking damages under a "deepening insolvency

---

[12] Spacek v. Thomen (In re Universal Farming Indus.), 873 F.2d 1334, 1335 (9th Cir. 1989).

[13] Id. at 1337.

[14] Stoumbos v. Kilimnik, 988 F.2d 949, 960, n.5 (9th Cir. 1993) (citing In re Universal Farming Industries, 873 F.2d at 1337).

theory," the expert on which appellee relies to quantify the harm acknowledged that his calculation was based on this theory.[15] Deepening insolvency has been defined as prolonging an insolvent corporation's life through bad debt, causing the dissipation of corporate assets.[16]

Appellee's expert estimated the value of the company at the time of the November 2003 loan and conducted a later evaluation in August of 2004, at the time the bankruptcy petition was filed. He testified that because the Wooleys made the November loan to the company, the company lost value and unsecured creditors were damaged as a result. He suggests that the Wooleys lent $2.5 million to the company in the face of obvious evidence that the financial condition of the company was deteriorating and they had no reason to believe that the loan would allow the company to survive. He assessed the lost value at $3.5 million.

The bankruptcy court did not accept this testimony. The court recognized that the Wooleys were "highly committed" to keeping the company going, and in its oral reasons the bankruptcy court stated: "Did they try to continue to make the company work? Yes, of course, they did. I have no question about that. Did they try to put this company back together? Yes, of course, they did."

A deepening insolvency theory of damages has been criticized and rejected by many courts.[17] We agree with the Third Circuit Court of Appeals, which

---

[15] See also Radnor Holdings Corp., et al. v. Tennenbaum Capital Partners et al. (In re Radnor Holdings Corp.), 353 B.R. 820, 842 (Bankr. D. Del. 2006) ("[S]imply calling a discredited deepening insolvency cause of action by some other name does not make it a claim that passes muster").

[16] See Official Comm. Of Unsecured Creditors v. R.F. Lafferty & Co., Inc., 267 F.3d 340, 350 (3d Cir. 2001); See also Official Comm. of Unsecured Creditors of Vartec Telecom, Inc. et. al. v. Rural Telephone Finance Coop. (In re VarTec Telecom, Inc)., 335 B.R. 631, 644 (Bankr. N.D. Tex 2005) (citing Kittay v. Atlantic Bank of N.Y. (In re Global Serv. Group), 316 B.R. 451, 458 (Bankr. S.D.N.Y. 2004)).

[17] See, e.g., Seitz v. Detweiler, Hershey & Assocs., P.C. (In re CitX Corp.), 448 F.3d 672, 678 (3d Cir. 2006) ("[t]he deepening of a firm's insolvency is not an independent form of

recently concluded that deepening insolvency is not a valid theory of damages.[18] The court recognized that deepening insolvency as a measure of harm depends on how the company uses the proceeds of the loan in question and "looks at the issue through hindsight bias."[19]

In the Delaware Court of Chancery, the doctrine of deepening insolvency as an independent cause of action or as a theory of damages was also considered and rejected:

> Even when a firm is insolvent, its directors may, in the appropriate exercise of their business judgment, take action that might, if it does not pan out, result in the firm being painted in a deeper hue of red. The fact that the residual claimants of the firm at that time are creditors does not mean that the directors cannot choose to continue the firm's operations in the hope that they can expand the inadequate pie such that the firm's creditors get a greater recovery. By doing so, the directors do not become a guarantor of success.[20]

---

corporate damage. Where an independent cause of action gives a firm a remedy for the increase in its liabilities, the decrease in fair asset value, or its lost profits, then the firm may recover, without reference to the incidental impact upon the solvency calculation") (citing Sabin Willett, The Shallows of Deepening Insolvency, 60 Bus. Law. 549, 552-57 (2005)); Joseph v. Frank, et al. (In re Troll Comm., LLC), 385 B.R. 110, 122 (Bankr. D. Del. 2008) (deepening insolvency is not a valid cause of action or theory of damages under Delaware law); Coroles v. Sabey, 79 P.3d 974, 983 (Utah Ct. App. 2003) (declining to recognize deepening insolvency as sufficient damages); Christians v. Grant Thornton, LLP, 733 N.W.2d 803, 812 (Minn. Ct. App. 2007) (deepening insolvency is not a recognized form of corporate damage in Minnesota); Comm. Fin. Servs., Inc. v. J.P. Morgan Securities, Inc., 152 P.3d 897, 900 (Okla. Civ. App. 2006) (deepening insolvency is not a recognized measure of damages in Oklahoma).

[18] See In re CitX Corp., 448 F.3d at 677.

[19] Id. at 678; see also Hugh McDonald, et al., Lafferty's Orphan: The Abandonment of Deepening Insolvency, Am. Bankr. Inst. J., Dec. 2007/Jan. 2008, at 59.

[20] Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P., 906 A.2d 168, 174 (Del. Ch. 2006); see also 3 Norton Bankr. L. & Prac. 3d § 53.3 (citing Trenwick Am. Litig. Trust, 906 A.2d at 174); see also Fla. Dep't of Ins. v. Chase Bank of Tex., N.A., 274 F.3d 924, 935 (5th Cir. 2001) (questioning the availability of a deepening insolvency theory in the liquidation of an insurance company).

Even if we were inclined to consider this theory, which we are not, the record does not support it. We agree with the bankruptcy court's analysis of the expert testimony and criticism of the expert's findings. For example, the bankruptcy court found that the expert's opinion that the company was not paying debts as they became due was "not supported by the facts." The bankruptcy court stated in his oral reasons:

> There was no detail [sic] review of the Debtors' accounts payable . . . nor was there any evidence that any of the Debtors were put on COD terms. The Plaintiff doesn't show any particular accounts that were paid late, let alone provide a sufficient volume of such accounts to prove that the Debtors were not generally paying their debts as they became due.

The bankruptcy court made no finding that the company was undercapitalized or insolvent. The bankruptcy court's findings on this point, which are fully supported by the record, undermine the expert's conclusion that the loans caused deepening insolvency. In sum, the Trustee's deepening insolvency theory — in addition to having little legal support — is not supported by the record or the bankruptcy court's findings.

## IV.

## CONCLUSION

The bankruptcy court made no finding that the Wooleys breached any obligations to the company or its creditors or that they engaged in inequitable conduct of any kind in connection with the April loan. With respect to the November loan, the bankruptcy court made no finding that Appellants' transactions with the debtor caused harm to either the debtor or the unsecured creditors. We have carefully considered the Trustee's damage theories and conclude that none are legally cognizable or supported by the record. Thus, neither claim should have been subordinated.

Accordingly, the district court's order affirming the bankruptcy court's order equitably subordinating both of John and Jeffrey Wooleys' claims is REVERSED, and judgment is RENDERED in favor of Appellants.

REVERSED and RENDERED.